**Christa G. BOHRER, Petitioner,**

v.

**CHURCH MUTUAL INSURANCE COMPANY, Respondent.**

No. 97SC240.

Supreme Court of Colorado, En Banc.

Sept. 21, 1998.

As Modified on Denial of Rehearing Oct. 26, 1998.

---

Seelen & Associates, Joyce Seelen, Stephen C. Rench, Denver, for Petitioner.

Senter Goldfarb & Rice, L.L.C., William L. Senter, Peter H. Doherty, Denver, for Respondent.

Justice HOBBS delivered the Opinion of the Court.

Christa G. Bohrer (Bohrer) appeals from the court of appeals unpublished opinion in *Bohrer v. Church Mutual Insurance Co.*, No. 95CA1692 (Colo.App. Jan. 30, 1997), affirming the order of the District Court for the

City and County of Denver denying and dismissing her traverse in a garnishment proceeding against Church Mutual Insurance Company (Church Mutual).

Bohrer obtained a judgment against Daniel DeHart (DeHart) for compensatory damages in the amount of $187,500 on claims of outrageous conduct and breach of fiduciary duty. Bohrer then attempted to collect the judgment against DeHart from Church Mutual, the insurer for DeHart's employers, the First Methodist Church of Greeley (Church) and the Rocky Mountain Conference of the United Methodist Church (Conference). The district court denied Bohrer's request for garnishment of insurance proceeds in accordance with the coverage, determining that DeHart was not an insured person under the terms of the policy.

The court of appeals affirmed the district court's order denying and dismissing the traverse on different grounds. It held that the damages Bohrer sought through her counseling claim were so intertwined with the charge of sexual misconduct as to render them inseparable and, therefore, excluded under the policy. *See Bohrer*, No. 95CA1692, slip op. at 4. We granted Bohrer's petition for certiorari to decide whether this policy "should be interpreted to defeat all coverage when only some activities fall within an exclusion to that coverage."

We now hold that allocation of the jury's compensatory damage award against DeHart between the covered counseling activities and the excluded sexual misconduct is necessary to effectuate the terms of the insurance policy. Accordingly, we remand for a hearing and determination by the district court on the traverse in the garnishment proceeding.

## I.

Bohrer began counseling with DeHart, the Church's youth minister, in May of 1983 when she was twelve. She first sought advice from DeHart's wife, who felt unable to handle her emotional problems. DeHart's wife encouraged her husband to assist Bohrer. Bohrer had family and self-esteem problems, and had contemplated suicide. According to Bohrer, DeHart almost immediately began confiding in her regarding personal problems of his own. Through the end of 1983, Bohrer regularly met with DeHart in his office at the Church and told him that she felt worthless and unlovable. According to Bohrer, DeHart confirmed that she was a bad person but informed her that he had a gift from God that enabled him to love even someone as bad as she was.

Throughout this first year of counseling, DeHart continued to confide in Bohrer regarding his marital problems and disagreements he had with the Church's other minister. Bohrer testified that DeHart also criticized her mother and other people she was close to, leaving her feeling isolated and dependent upon him. No physical contact occurred in this first year.

Bohrer said that sometime towards the summer of 1984, DeHart began sitting closer to her, occasionally putting his arm around her or putting a hand on her leg. He also began telling Bohrer about sexual problems he was having with his wife. Bohrer was thirteen at the time. In February of 1985, twenty-one months after the counseling relationship commenced, DeHart initiated intimate fondling and, in June of 1985, DeHart engaged Bohrer in sexual intercourse after attending a church-related event in Fort Collins. The sexual relationship continued intensively until 1988 when Bohrer was eighteen and began her college education.

After beginning counseling at college, Bohrer approached the Church and the Conference regarding DeHart's behavior and also filed a criminal complaint against him. DeHart eventually pled guilty to one felony count of sexual assault on a child by a person in a position of trust and one misdemeanor count of third degree sexual assault. The court placed DeHart on probation for the felony and work release for the misdemeanor. The court also ordered restitution in an amount to be determined later.

Bohrer filed a civil suit against DeHart, the Church, and the Conference. After obtaining jury verdicts and judgments against all three defendants,[1] Bohrer initiated a gar-

---

1. For a discussion of the civil case and the procedural history of that case, *see Bohrer v. DeHart*, 961 P.2d 472 (Colo.1998), in which we reinstated the jury's verdict. Against DeHart, the jury awarded to Bohrer past economic damages in the amount of $17,000, past non-economic dam-

nishment action in the district court against Church Mutual to collect the $187,500 compensatory damage award against DeHart.

Both the Church and the Conference held insurance policies covering their clergy during the period of DeHart's relationship with Bohrer. The Church and the Conference settled claims against them while petitions for certiorari were pending before this court. Payment of those settlement amounts by Church Mutual is not now before this court. In addition, the $187,500 punitive damages award against DeHart is not at issue. The garnishment action in the district court sought insurance proceeds only for the compensatory award against DeHart.

The court of appeals determined that the personal injury and property damage coverage of the policy did not apply to the claims against DeHart because DeHart's actions were intentional, not accidental, and were outside the coverage. *See Bohrer*, No. 95CA1692, slip op. at 3–4. The court of appeals also determined that the sexual misconduct coverage available to the Church and Conference did not apply to DeHart because of that coverage's exclusion prohibiting payment on behalf of "any person who personally participated in any act of sexual misconduct or sexual molestation." *Id.* at 5. Bohrer did not appeal either of these determinations by the court of appeals.

Therefore, only the counseling liability coverage is at issue in this case. The relevant portion of the insurance contract provides:

> The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of any acts, errors, or omissions of the insured, arising out of counseling activities of the insured or counseling activities of others for which the insured is liable.[2]
>
> . . .
>
> This insurance does not apply: . . . (9)[to] liability resulting from any actual conduct of a sexual nature.

Church Mutual denied coverage for the claims against DeHart by its answer to the writ of garnishment. Bohrer filed her traverse, claiming that the counseling relationship led to all of the damages and should be covered. The district court dismissed the garnishment action because DeHart was "not an insured under the subject policy." The court of appeals affirmed, but on different grounds, holding that the damages sought for the counseling activities were "so intertwined with the charge of sexual misconduct as to render them inseparable." *Bohrer*, No. 95CA1692, slip op. at 4.

## II.

We reverse. We hold that DeHart is an insured person under the policy as to his counseling activities. Bohrer holds a judgment against DeHart for compensatory damages based on his counseling and sexual misconduct activities. Because the counseling relationship predated and continued for a period of time prior to the sexual conduct, the causes are separable. Hence, we also hold that the compensatory damages awarded against DeHart in the tort case must be allocated between the coverage and the exclusion. On remand, in order to effectuate the insurance policy's plain meaning, the district court shall hold a hearing on Bohrer's traverse and determine how the jury's compensatory award against DeHart is to be allocated between the period of counseling activities and the period of excluded sexual conduct.

### A.

#### The Insurance Policy

■ Insurance policies are contracts. Interpretation of an insurance contract is a matter of law which we review de novo. *See State Farm Mut. Auto. Ins. Co. v. Stein*, 940 P.2d 384, 387 (Colo.1997). General rules of contract interpretation apply; we accord contract terms their plain and ordinary meanings. *See id.; see also Carroll v. CUNA Mut. Ins. Soc'y*, 894 P.2d 746, 749–50 (Colo.

---

ages of $50,000, future economic damages of $93,500, and future non-economic damages of $27,000. The jury also awarded punitive damages of $187,500 against DeHart. *See id.* app. A, at 480.

**2.** The insurance policy placed a $300,000 limit per claim and in the aggregate as to coverage for counseling liability.

1995) (construing common meaning of words to fulfill reasonable expectations of ordinary person purchasing policy). We should avoid disrupting the parties' settled expectations and the purposes for coverage as expressed or implied in the insurance policy. *See O'Connor v. Proprietors Ins. Co.,* 696 P.2d 282, 285 (Colo.1985).

■ An insurance contract must be construed in favor of coverage and against limitations when provisions within the policy conflict with one another or are ambiguous. *See Ryder Truck Rental, Inc. v. Guaranty Nat'l Ins. Co.,* 770 P.2d 1380, 1382 (Colo.App.1989). Exclusionary clauses that insulate certain conduct from coverage must be written in clear and specific language, *see American Family Mut. Ins. Co. v. Johnson,* 816 P.2d 952, 953 (Colo.1991), and are to be interpreted against defeat of the coverage. *See, e.g., State Auto. & Cas. Underwriters v. Beeson,* 183 Colo. 284, 291, 516 P.2d 623, 626 (1973).

■ The insurance contract at issue in this case is unambiguous; the plain and ordinary meanings of the terms regarding coverage and exclusion from coverage can be given effect. DeHart is an insured under the policy since he was a "minister" at the time the coverage was in effect. The policy insures "any employee occupying a position scheduled in the 'Schedule of Positions Covered.'" The Schedule of Positions Covered names "ministers" as insured persons.

Under the policy, Church Mutual insured DeHart against liability arising from "any acts, errors, or omissions of the insured, arising out of counseling activities." While DeHart's counseling activities were covered, his sexual conduct was not.

■ The policy specifically excludes "liability resulting from any actual conduct of a sexual nature." The policy does not contain a definition of "actual conduct of a sexual nature." Absent a definition of a term in a document or policy, we may utilize the plain and generally accepted meaning of the term. *See Kane v. Royal Ins. Co. of Am.,* 768 P.2d 678, 680 (Colo.1989). The ordinary meaning of "sexual" is "of, relating to, or associated with sex." *Merriam Webster's Collegiate Dictionary* (10th ed.1995).

The dictionary definition fails to provide guiding detail in determining which of De-Hart's activities were sexual in nature. Since we have a duty to give effect to the coverage provision and the exclusion provision, if possible, we must inquire into the basis of both. The exclusion provision here implicates a well-established public policy.

Historically, courts have held that it is "contrary to public policy to insure against liability arising directly against the insured from intentional or willful wrongs, including the results and penalties of the insured's own criminal acts." 7 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 101:22 (3d ed.1997); *see also Johnson,* 816 P.2d at 957 (stating that the purpose of excluding intentional injuries from coverage is to "prevent extending to the insured a license to commit harmful, wanton or malicious acts").

In the absence of an insurance policy definition of "actual sexual conduct," we look to legislation adopted by the Colorado General Assembly for guidance. *See Huizar v. Allstate Ins. Co.,* 952 P.2d 342, 344 (Colo.1998). DeHart was convicted of sexual assault on a minor. We have previously held that an intentional harm will be inferred when the insured has engaged in such sexual misconduct. *See Allstate Ins. Co. v. Troelstrup,* 789 P.2d 415, 419 (Colo.1990). Colorado statutes dealing with unlawful sexual behavior define "sexual contact" as:

> the knowing touching of the victim's intimate parts by the actor, or of the actor's intimate parts by the victim, or the knowing touching of the clothing covering the immediate area of the victim's or actor's intimate parts if that sexual contact is for the purposes of sexual arousal, gratification, or abuse.

§ 18–3–401(4), 6 C.R.S. (1998).

■ We conclude that the sexual conduct exclusion of this insurance policy's counseling coverage implements a public policy against insuring intentional or willful wrongful acts. The Colorado statutory definition of sexual contact provides the district court and us with a clear standard for determining what portion of DeHart's conduct was sexual in

nature under the "actual sexual conduct" exclusion.[3]

### B.

### *Separation of Counseling and Sexual Misconduct Activities*

The jury found DeHart liable for breach of fiduciary duty and outrageous conduct. The court of appeals decided that the damages caused by DeHart's counseling of Bohrer were "so intertwined with the charge of sexual misconduct as to render them inseparable." *Bohrer*, No. 95CA1692, slip op. at 4.

We read the record and the applicable law otherwise. Had no sexual contact taken place, Bohrer could have had a viable claim against DeHart for breach of fiduciary duty based solely on counseling activities for which the coverage of this policy is answerable. *See Moses v. Diocese of Colorado*, 863 P.2d 310, 323 (Colo.1993) (stating that bishop assumed role of counselor to parishioner and had a duty to act with the utmost good faith for her benefit, but failed to assist counselee and, instead, used her trust in him to her detriment).

### 1. *DeHart's Counseling Activities*

Although DeHart disputed at trial that he was Bohrer's counselor, the record demonstrates that he undertook a counseling role. DeHart's wife recognized that she was unprepared to deal with Bohrer's emotional problems and referred Bohrer to her husband for counseling in his capacity as youth minister. Upon learning that Bohrer's father had verbally and physically abused her for a number of years and that Bohrer had contemplated suicide, DeHart advised her to place her trust in him and acted to discourage her from seeking counsel by others.

In meetings at his office, over the telephone, and on youth field trips, DeHart proceeded to advise Bohrer about her emotional problems and family relationships. As DeHart's personal relationship with his wife deteriorated, he began discussing his personal problems with Bohrer while she was seeking help and depending on his counsel.

■ Late in 1984, DeHart told Bohrer that he loved her. She asked him whether he meant this in a fatherly sense. DeHart explained that he loved her in a romantic sense. Instead of recognizing that his personal feelings in this regard might impair the best interests of his counselee, ceasing the counseling relationship, and referring her to another counselor, DeHart continued to advise Bohrer in violation of his duty of trust.

■ We have previously articulated that the responsible party in the trust relationship has a duty to recommend counseling by another if that is in the troubled person's best interest. *See Moses*, 863 P.2d at 323. In *Moses*, we said:

Acting as the representative for the Diocese, Bishop Frey failed to assist Tenantry in understanding that she was not the only person responsible for her sexual relationship with Father Robinson. He did not recommend counseling for Tenantry but did recommend counseling for Father Robinson and ordered Father Robinson to make progress reports on the counseling. Bishop Frey's only action in regard to Tenantry was to bind her to secrecy. Thus, Bishop Frey assumed control of a situation that demanded he consider Tenantry's interests and then used Tenantry's trust to her detriment.

*Id.*

Referral to another counselor is particularly necessary when the first counselor has become emotionally involved with the counse-

---

**3.** In *Bear Valley Church of Christ v. DeBose*, 928 P.2d 1315, 1327, 1331 (Colo.1996), we reinstated a jury verdict against a minister for breach of fiduciary duty based on an inappropriate counseling technique that included repeated touching of a child. *See also Winkler v. Rocky Mountain Conference of United Methodist Church*, 923 P.2d 152 (Colo.App. 1995). In the absence of an insurance policy definition, or exclusion provision such as in *Jane D. v. Ordinary Mut.*, 32 Cal.App.4th 643, 38 Cal.Rptr.2d 131, 136 (Cal. App. 1995), which excepted behavior "leading to or culminating" in any sexual act, we apply the "sexual contact" definition of the Colorado Criminal Code because it describes activities that are plainly within Colorado's public policy exception to insurance coverage and the intent of this insurance policy, giving effect to both the counseling coverage and the sexual misconduct exclusion.

lee and is unable to provide the appropriate counseling. Doctor Frederick M. Miller, a psychiatrist, testified in the jury trial that the beneficial counseling Bohrer needed at age twelve had been postponed for six years as a direct result of DeHart's failure to afford her proper counseling. His opinion was that DeHart's counseling activities aggravated her already poor relationship with her parents, made her susceptible to the sexual conduct DeHart pursued, impaired her ability to trust others, and contributed to her emotional and physical distress.[4]

■ DeHart should have recognized the boundaries of the counseling relationship, advised her to seek another counselor, and ceased counseling her. *See St. Paul Fire & Marine Ins. Co. v. Love*, 459 N.W.2d 698, 700, 702 (Minn.1990)(recognizing insurance coverage for counselor's inappropriate response to his counselee's best interest). Instead, DeHart breached the boundaries of this trust relationship by imposing on her his own feelings of inadequacy and isolation, his marital difficulties, and fulfillment of his emotional needs. Failure to take appropriate action in his counselee's best interest is a risk for which Church Mutual insured DeHart under the policy's counseling coverage.

### 2. DeHart's Sexual Misconduct

DeHart's sexual misconduct occurred after a prolonged period of counseling Bohrer. In February of 1985, DeHart began touching her breasts and genitals. In June of 1985, DeHart first had sexual intercourse with her. Bohrer was fourteen years of age. Bohrer testified that sexual intercourse occurred approximately three times a week thereafter, until she was eighteen and had commenced college.

■ When the covered conduct causes injury resulting in damages, and the excluded conduct has not occurred in close temporal and spatial relationship to the covered conduct, coverage is not defeated by the ex-

---

4. Dr. Miller's testimony included the following:
Q: Okay. Ms. Bohrer also had problems with self-esteem as a result of the—both the abuse and neglect by her father and mother respectively in her early formative years correct?
A: Absolutely. Her father's relationship with her was dreadfully disruptive to any health [sic] sense of self-esteem. The insults and language that he used were very traumatic and inappropriate.
. . . .
Q: Do you have an opinion, within a reasonable degree of psychiatric probability, as to whether or not Christa was harmed by her relationship with Daniel DeHart?
A: I believe—yes, I do.
Q: What's that opinion?
A: I believe that she was significantly harmed by her relationship with Daniel DeHart.
Q: Tell the jury in what way.
A: A 12–year–old girl who has grown up in a troubled and dysfunctional setting manages, at that point in time, to present herself for some help; goes to Mrs. DeHart and asks for some help; is referred to Daniel DeHart for additional kinds of help, and then, through the years twelve through eighteen—when, hopefully, help would have been at its most effective, when she was receptive to asking for it and trusting enough sufficiently to want help and to be able to hear and to use it—she's betrayed.
She is abused by him in a way that no 12–year–old should ever be abused by someone sixteen years older, in a position of trust. She certainly is given—at least superficially—a loving and caring setting, which adds to the betrayal in

a sense, in that he creates and offers a warmth which had not been known. He fills a need that she was desperate for from the void in her life early on, and then lets her down, and then betrays the trust; rather than help her early on, contributes to her feeling more and more guilty about her relationship with her parents, and then essentially imposes himself upon her sexually and religiously in a way that I don't believe that a 12–, 13–, 14– or 15–year–old is able to handle, even if they were healthy and not struggling with a developmental arrest.
But given the developmental arrest that I think was going on, Christa was even greatly more disadvantaged in being able to deal with this individual who, in a sense, promised her so much and offered her so much that she had not previously had, and then took advantage of her.
. . . .
A: ... I think that her physical complaints, across the board, related to the trauma that she experienced, the abuse that she experienced in the relationship with him.
It's not exclusive; they certainly relate, also, to the other important developmental and traumatic issues that she struggled with in the past, but she, given the history that she relates, has developed a physical condition, a complex physical condition that is, in part, caused by her experiences with Mr. DeHart, by the fact that her psychiatric condition was allowed to languish for those six years, and that she did not have the opportunity for treatment from the age of twelve on that might well have produced a different outcome.

clusion. *See Horace Mann Ins. Co. v. Barbara B.,* 4 Cal.4th 1076, 17 Cal.Rptr.2d 210, 846 P.2d 792, 797 (1993) (concluding that damages from covered and excluded causes were not "in such close temporal and spatial proximity ... as to *compel* the conclusion that they are inseparable," therefore insurer's duty to defend was implicated) (emphasis in original).

■ Under the facts of the case, the counseling and the sexual misconduct activities became so intertwined as to render them inseparable from the time sexual fondling commenced in February of 1985 to the time Bohrer began college. Thus, we conclude that DeHart was not insured for the risk of his activities during this period, but he was insured for the risks incurred during the counseling period.

In reaching this conclusion, we reject the court of appeals total preclusion of coverage which it reached in reliance on *Houg v. State Farm Fire & Casualty Co.,* 509 N.W.2d 590 (Minn.App.1993). There, the counselee was an adult woman seeking marital counseling who premised her case on an accusation that a member of the clergy "set out on a course of conduct designed to entice and seduce her into sexual relations." *Houg,* 509 N.W.2d at 591. The counselee in *Houg* apparently made no showing that harmful counseling had taken place before the "conduct of a sexual nature" which triggered the insurance policy's exclusion. *Id.*

DeHart's errors and omissions during the extended period of counseling are separable from the excluded conduct, and damages ascribable to the counseling activities are within the insurance policy's coverage.

## C.

### Multiple Cause Analysis

"[T]he liability of the insurer depends upon whether the damages sustained were a result of a risk or hazard against which the insured was covered by the policy." *Couch on Insurance, supra,* § 101:41.

A covered cause and an excluded cause are at issue in this garnishment action. Couch describes the "independent concurrent cause rule" as being potentially applicable in such circumstances. *Id.* § 101:50. When an

> insured sustains a loss which is partly due to a covered cause and partly to one which is not covered, and it is possible to allocate to each the amount of loss caused thereby, it is apparent that the insurer is only liable for that part of the total loss which is shown to have been the result of the "covered" cause.

*Id.; see also Jane D.,* 32 Cal.App.4th 643, 38 Cal.Rptr.2d at 136 (1995) ("An allegation of sexual misconduct does not preclude coverage if there are other allegations of conduct that is covered.").[5]

■ Couch identifies other rules that may potentially apply to multiple cause cases. Bohrer invokes them here. She argues that DeHart's counseling activities "caused" his sexual misconduct and the policy should answer for the entire compensatory award. Although this theory finds some support in both the "efficient proximate cause" and the "concurrent cause" rules, *see Couch on Insurance, supra,* § 101:57, we reject application of either in favor of allocating Bohrer's compensatory damage award between the coverage and the exclusion, utilizing the independent concurrent cause rule.

The efficient proximate cause rule can result in recovery for the entire loss when the covered risk in comparison with non-covered risks "set the other causes in motion which, in an unbroken sequence, produced the result for which recovery is sought." *Id.* § 101:57. The concurrent cause rule can result in full recovery when two or more causes "appreci-

5. The *Jane D.* court, like the court of appeals in this case, found that the plaintiff's injuries were "inseparably intertwined." *Jane D.,* 38 Cal. Rptr.2d at 137. The court noted that "none of the allegations of [the priest's] malfeasance in counseling stands separate from the allegation of sexual misconduct." *Id.* In other words, in *Jane D.,* the entire case rested on the allegation that the priest used his position, from the beginning, to seduce the plaintiff. That is not this case. *Jane D.* is also distinguishable because the exclusion in that case applied to "licentious, immoral or sexual behavior intended to lead to or culminating in any sexual act." *Id.* at 136. Under that policy language, nonsexual counseling activity that ultimately leads to sexual activity is expressly excluded from coverage.

ably contribute to the loss, and at least one of the causes is an included risk under the policy." *Id.*

Our court of appeals adopted yet another approach. It held that the exclusion prevails in light of the sexual misconduct charge. *See Bohrer*, No. 95CA1692, slip op. at 4 (relying on *Houg*, 509 N.W.2d at 593). This approach vindicates the public policy against insuring intentional or willful wrongful acts but renders the innocent third-party victim without recourse to insurance proceeds for covered acts that also occurred.

We apply the independent concurrent cause rule in light of the contract language and the facts of this case. Church Mutual covered the risk of DeHart's counseling activities but excepted "actual conduct of a sexual nature." Bohrer was the third-party victim of both types of activity by DeHart. The victim is a third-party beneficiary of the insurance policy whose interest is to be protected in insurance cases. *See Couch on Insurance, supra,* § 101:58.

At the same time, to apply a rule that entirely defeats the exclusion would effectively recompense DeHart for damages owed on account of his intentional, willful wrong. We reject this alternative as contrary to the terms of the contract and public policy. In *Kane v. Royal Insurance Co. of America,* 768 P.2d 678, 684–85 (Colo.1989), we held that the efficient proximate cause rule must yield to the language of the insurance policy in question.

We conclude that allocation of the jury's compensatory award between coverage and exclusion best implements the plain intent of the parties to the insurance contract and Colorado public policy. Here, the counseling relationship predated and continued for a period of time prior to the excluded sexual conduct; thus, the causes are separable.

## D.

### *The Garnishment Proceeding*

The proper interpretation and enforcement of this insurance policy arose in the context of garnishment. Garnishment is "a statutory proceeding whereby a plaintiff in attachment or a judgment creditor seeks to subject to his claim or judgment property of the defendant debtor in the hands of a third person or money owed by a third person to the defendant debtor." 10 Stephen W. Seifert, *Colorado Creditors' Remedies—Debtor's Relief* § 7.94 (1990).[6]

 Garnishment is authorized by Rule 103 of the Colorado Rules of Civil Procedure. It can be used to aid a plaintiff in monetary recovery after a judgment. *See* C.R.C.P. 103 §§ 1–4. Garnishment is an appropriate context for resolving coverage issues in a third party victim insurance case.[7] *See, e.g., Worchester v. State Farm Mut. Auto. Ins. Co.,* 172 Colo. 352, 354–57, 473 P.2d 711, 712–14 (1970).

---

6. "Garnishment proceedings are initiated by the issuance of a writ of garnishment by the clerk of the court (or the judge for writs of support) upon request of the ... judgment creditor.... The garnishee must then answer the questions contained in the writ and various forms under oath." *Colorado Creditor's Remedies—Debtor's Relief, supra,* § 7.104. The judgment creditor may file a traverse. *See* C.R.C.P. 103 § 8(a). If a traverse is filed, upon application of the judgment creditor, the court shall set a hearing on the traverse. *See* C.R.C.P. 103 § 8(b)(2). The judgment creditor, as garnishor, has the burden to establish the liability of the garnishee to the debtor. *See Security Trust Co. v. Kilpatrick,* 164 Colo. 261, 263, 434 P.2d 123, 124 (1967); *Metropolitan Indus. Bank v. Great W. Prod. Corp.,* 158 Colo. 198, 199–200, 405 P.2d 944, 945–46 (1965).

7. Church Mutual assumed DeHart's defense under a reservation of rights. Declaratory judgments are typically used when the duty to defend

or indemnify arises. *See Allstate Ins. Co. v. Troelstrup,* 789 P.2d 415, 416 (Colo.1990). No declaratory judgment action concerning coverage was initiated by the insurance company or any party. Allocation of damages among the causes is more frequently found in declaratory judgment actions. *See Cuevas v. Allstate Ins. Co.,* 872 F.Supp. 737 (S.D.Cal.1994); *Sabella v. Wisler,* 59 Cal.2d 21, 27 Cal.Rptr. 689, 377 P.2d 889 (1963). Declaratory judgment actions have been used in Colorado for allocation of damages awards by a jury as between insurance carriers. *See Continental Cas. Co. v. Empire Cas. Co.,* 713 P.2d 384 (Colo.App.1985), *overruled on other grounds by Lininger ex rel. Lininger v. Eisenbaum,* 764 P.2d 1202, 1210 (Colo.1988). The trial court is in the same position in this garnishment action, as in a declaratory judgment action, with regard to the opportunity for both parties to develop and present their positions.

By answer in this garnishment proceeding, Church Mutual denied coverage, and Bohrer filed a traverse placing the matter at issue. C.R.C.P. 103, section 8(b) provides that "the traverse shall be set for hearing before the court." An evidentiary hearing may or may not be necessary. *See Haselden Langley Constr., Inc. v. Graybar Elec. Co.,* 662 P.2d 1064, 1065–66 (Colo.1983) (judging that garnishor whose traverse was determined adversely by summary judgment was entitled to present evidence in support of allegations).

Here, the district court, based on contractual causation principles, must make an allocation of damages determination that the jury has not made. Contractual causation analysis is different from tortious causation analysis. *See Couch on Insurance, supra,* § 101:41. The tort trial concerns the question of civil culpability, whereas the insurance determination deals with whether the damages sustained were a result of a risk or hazard for which the insured had coverage.

Although the jury does not ordinarily allocate damages between causes of action against a person in a tort case, the need and manner of making an allocation in other contexts is a familiar aspect of our justice system.[8] For example, juries and judges in bench trials regularly separate and allocate the relative degree of fault between parties under complicated factual circumstances. *See, e.g.,* § 13–21–111(2)(b), 5 C.R.S. (1998) (requiring the trier of fact to determine the "degree of negligence of each party, expressed as a percentage" so that the total damages awarded can be allocated between the responsible parties); *see also* § 13–21–111.5(2), 5 C.R.S. (1998). Although a jury might not be able to say with specificity or absolute certainty which item of conduct actually caused a particular injury, we instruct jurors to "use your best judgment based on the evidence" when uncertainty arises re-

garding the amount of damages to be awarded. C.J.I.-Civ.3d 5:5.

On remand, Bohrer is entitled to a hearing on her traverse in accordance with C.R.C.P. 103, section 8. The district court shall determine the extent to which the compensatory damages are attributed to (1) counseling and (2) sexual misconduct. We conclude that the opportunity for an evidentiary hearing to receive expert testimony is necessary in this case on the allocation of damages issue. The parties may offer expert testimony and may cite portions of the record of the underlying tort case, for consideration by the district court in determining how the allocation between the coverage and exclusion shall be made.[9]

Following the hearing, the court shall make its determination as to the proper allocation and (1) enter findings, conclusions, and a judgment against Church Mutual ordering payment out of policy proceeds for the damages ascribable to the counseling period and (2) refuse to order the payment for damages ascribable to the period of sexual misconduct.

### III.

Accordingly, we reverse and remand this case to the court of appeals, with directions to return it to the district court for hearing and determination in accordance with this opinion.

---

**8.** The jury was not presented with special interrogatories regarding the apportionment of its compensatory damages award between the multiple causes. We recognize that injecting insurance issues into the tort trial may confuse the jury, add to the complexity of the instructions, and enlarge the case to insurance coverage questions that, traditionally, are not presented to the jury. We have not found any authority that

would have compelled Bohrer to have the jury make special findings on the coverage and allocation of damages issue she sought to resolve through her traverse.

**9.** The purpose of this hearing is not to retry the tort case, but to take expert testimony admissible under CRE 703 on the damages allocation issue.