**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 3 2003**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

NATIONAL CHIROPRACTIC
MUTUAL INSURANCE COMPANY, an
Iowa corporation,

      Plaintiff-Counter-Defendant-
      Appellee,

v.

WILLIAM E. KANCILIA, D.C.,

      Defendant,

and

DENISE L. FAHY; MICHELE
PEARSON,

      Defendants-Counter-Claimants-
      Appellants.

No. 02-1452

(D.C. No. 01-WY-2053-CB)
(D. Colorado)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE**, **McKAY,** and **MURPHY**, Circuit Judges.

      Plaintiff National Chiropractic Mutual Insurance Company (NCMIC) filed this

diversity action seeking a declaration that it was not obligated under two professional

---

      [*]This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. The court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

liability insurance policies issued to defendant William Kancilia to indemnify him against state court judgments obtained by defendants Denise Fahy and Michele Pearson. Fahy and Pearson appeal the district court's entry of summary judgment in favor of NCMIC. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

## I.

NCMIC, an Iowa corporation, provides professional liability insurance coverage for licensed chiropractors. Kancilia, who is not a party to this appeal, is a resident of Colorado and, at all relevant times, was a licensed chiropractor in Colorado. Fahy is a resident of Nebraska and Pearson is a resident of Colorado. During the period from March 2, 1993, through September 3, 1995, NCMIC provided professional liability insurance coverage to Kancilia. NCMIC first issued policy No. MP 080662 to Kancilia, effective March 2, 1993. It was replaced by policy No. MO 082510, effective September 3, 1993, through September 3, 1995.

On July 18, 1995, Fahy and Pearson, former patients and employees of Kancilia, filed suit against Kancilia in Colorado state court asserting a number of tort claims under Colorado state law (Fahy/Pearson action). Kancilia notified NCMIC of the Fahy/Pearson action and, in response, NCMIC issued a reservation of rights letter and assigned an attorney to represent Kancilia. The Fahy/Pearson action proceeded to trial where a jury found in favor of Fahy and Pearson on their claims for negligence and outrageous conduct, and for Pearson on her claim for invasion of privacy.

Kancilia thereafter made a demand upon NCMIC for indemnification. Fahy and Pearson made a demand upon NCMIC for payment of the judgment. NCMIC responded by filing this diversity action seeking a declaration that it was not obligated under the two professional liability policies at issue to indemnify Kancilia or otherwise pay the judgments rendered in the Fahy/Pearson action. The district court granted summary judgment in favor of NCMIC.

## II.

We review the district court's grant of summary judgment de novo, applying the same standards as the district court under Federal Rule of Civil Procedure 56(c). Perry v. Woodward, 199 F.3d 1126, 1131 (10th Cir. 1999). A grant of summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). In applying this standard, "the substantive law will identify which facts are material." Id. at 248. Because this is a diversity case, we apply the substantive law of Colorado, the forum state. See Sapone v. Grand Targhee, Inc., 308 F.3d 1096, 1100 (10th Cir. 2002). If "no [Colorado] cases exist on a point, we turn to other state court decisions, federal decisions, and the general weight and trend of authority." Id. (internal quotations omitted). In doing so, we "must predict how [Colorado's] highest court would resolve" the point. Reed v. Landstar Ligon, Inc., 314 F.3d 447, 451 (10th Cir. 2002).

III.

*Policy coverage for state court judgments*

Fahy and Pearson contend that the district court erred in concluding the policies at issue did not provide coverage for their state court judgments against Kancilia. Under Colorado law, contracts of insurance are governed by the general rules of contract interpretation. See Bohrer v. Church Mut. Ins. Co., 965 P.2d 1258, 1261 (Colo. 1998). Thus, contract terms are accorded "their plain and ordinary meanings," id. at 1262; see also Scott's Liquid Gold, Inc. v. Lexington Ins. Co., 293 F.3d 1180, 1184 (10th Cir. 2002) (stating that, under Colorado law, a contract of insurance "is interpreted according to the plain and ordinary meaning of its language"), and "[a] court should enforce [an] insurance contract as written, unless an ambiguity exists." Scott's, 293 F.3d at 1184. "Exclusionary clauses that insulate certain conduct from coverage must be written in clear and specific language and are to be interpreted against defeat of the coverage." Bohrer, 965 P.2d at 1262. "[B]ecause of the unique nature of insurance contracts and the relationship between the insurer and insured, [the Colorado] courts do construe ambiguous provisions against the insurer and in favor of providing coverage to the insured." Cyprus Amax Minerals Co. v. Lexington Ins. Co., 74 P.3d 294, 299 (Colo. 2003). Under Colorado law, "[a] court's interpretation of an insurance contract is a matter of law, subject to de novo review." Id.

*Policies* – The two insurance contracts at issue contain substantially similar

4

language. Policy No. MP 080662 contains the following relevant provisions:

**Coverage Agreement**
  The company will pay on behalf of the insured all sums . . . which the insured shall become legally obligated to pay as damages because of injury caused by accident arising out of the rendering of or failure to render to a patient during the policy period, professional services by the named insured as a chiropractor in any jurisdiction where the insured is duly licensed . . . .
    * * *

**Definitions**
  When used in this policy (including endorsements forming a part hereof):
    "injury" means bodily injury, sickness, or disease sustained by any one person but it shall not include claims of false imprisonment, false arrest, libel, slander, defamation, invasion of privacy, sexual assault or impropriety;
    * * *
    "professional services" means only those services usually and customarily furnished by Chiropractors . . . .
    * * *

**Exclusions**
  This policy does not apply to injury resulting from:
    * * *
  (f) Regardless of any other provision in this policy, this policy does not apply to punitive or exemplary damages.

App. at 506-07. Policy No. MO 082510 contains similar provisions:

**Definitions**
    * * *
  2. Damages mean the monetary portion of any judgment, award or settlement, but does not include:
    (a) punitive or exemplary damages, any damages that are a multiple of compensatory damages, fines, penalties or sanctions . . . .
  3. Injury means bodily injury, sickness, disease or death sustained by any one person.
  4. Professional services means only those services usually and customarily furnished by chiropractors. * * *

5

**Coverage Agreement**

Within the limits of liability shown on the Declaration, we will pay all sums to which this insurance applies and which you become legally obligated to pay as damages because of an injury. The injury must be caused by an accident arising out of the providing or failure to provide professional services to a patient during the policy period. The injury also must be caused by you, or another insured, under this policy.
* * *

**Exclusions**

Despite any other provision of this policy, this policy does not apply to injury resulting in whole or in part from:
* * *

J. False imprisonment; false arrest; libel; slander; defamation; invasion of privacy; sexual impropriety; sexual intimacy, or assault.
* * *

O. The intentional infliction of injury.
* * *

R. This policy does not apply to punitive or exemplary damages, fines, penalties imposed by law, or matters uninsurable under law pursuant to which this policy is construed.

Id. at 511-12.

*Underlying state court action* -- In order to determine whether the policies provide coverage for the judgments obtained by Fahy and Pearson against Kancilia, we must review the claims asserted in the underlying action and the arguments and evidence presented by Fahy and Pearson in support of those claims. As previously noted, the underlying action proceeded to trial on five claims, two by Fahy and three by Pearson. Both asserted claims for "negligence of a chiropractor" and for outrageous conduct. Pearson also asserted a claim for invasion of privacy. During opening statements, the attorney for Fahy and Pearson generally described the case as one involving "sexual harassment." App. at 735.

6

Pearson testified that she moved to Colorado in July 1993 following a divorce. She met Kancilia two months later at a social event at a Denver surgery center where she worked in collections. According to Pearson, Kancilia reminded her of her ex-husband, who was also a chiropractor. Shortly after meeting Kancilia, Pearson became his patient and began regularly seeing him for chiropractic treatment. During her visits in the fall of 1993, Kancilia was "chatty," asked personal questions, and sometimes told her sexually-oriented jokes. Id. at 759-60. Kancilia offered Pearson a job at his clinic and Pearson began working for Kancilia as his office manager on January 17, 1994. Kancilia continued to ask about her personal life and tell her sexually-oriented jokes. Kancilia also used profanity in the office on a regular basis, regularly talked about his own personal life, including his sexual frustration with his wife, and often volunteered to show Pearson his tattoos (which were located on his hips). Kancilia, together with a patient who was his tattoo artist, regularly urged Pearson to get a tattoo and in late February or early March 1994, she agreed. Kancilia accompanied Pearson to the tattoo shop and persuaded her to get a "she devil" tattoo on her right hip. Id. at 788.

Pearson began a sexual relationship with Kancilia in late winter or early spring of 1994. After their first sexual encounter, Kancilia began asking Pearson for sex on a regular basis and Pearson acquiesced. In particular, between May and August 1994, Kancilia allegedly demanded sex from Pearson at the office approximately two times per

week, and at her apartment before work approximately three times per week.[1]  Pearson testified that she believed she did not have a choice because Kancilia was her employer. Pearson stated that, in the early morning hours of August 15, 1994, Kancilia telephoned her at her apartment and asked if he could stop on his way to the airport to fly to California.  Pearson refused and Kancilia responded by yelling at her and hanging up. When she arrived at work later that day, she could not find her paycheck.  Kancilia telephoned her at the office later that day and said, "Just remember, if you don't scratch my back, I won't scratch yours.  You'll have to wait [for your paycheck] till I get back." Id. at 851.

Denise Fahy provided a somewhat similar story.  Fahy testified that shortly after moving to Denver with her husband and children in 1993, she received a phone call from a telemarketer who informed her that Kancilia was offering free initial exams for chiropractic problems.  Fahy, who suffered from severe migraine headaches as well as neck and shoulder problems, accepted the telemarketer's offer of a free exam with Kancilia.  The exam occurred in July 1993 at Kancilia's office and Fahy began seeing Kancilia as a patient on a regular basis.  Kancilia frequently asked Fahy personal questions and began telling sexually-oriented jokes.  Fahy disclosed that she was having marital difficulties and that her husband was an alcoholic.  Fahy also informed Kancilia

---

[1] Kancilia continued to treat Pearson's chiropractic problems for a short time after their sexual relationship began.  Both Kancilia and Pearson ultimately agreed, however, that it would be best for Pearson to receive treatment from Kancilia's partner.

that she was lonely and did not have any friends in her neighborhood. Approximately a month after she began seeing Kancilia as a patient, Fahy experienced a severe migraine headache. Although it was a Saturday, Fahy telephoned Kancilia and he told her to meet him at his office. According to Fahy, Kancilia gave her a treatment that substantially relieved her migraine symptoms. Kancilia again relieved Fahy's migraine symptoms after a subsequent episode. After that episode, Kancilia suggested to Fahy that she divorce her husband and "find a chiropractor to marry." Id. at 1110.

During an office visit in August 1993, Kancilia suggested that Fahy go for a drink with him since she was lonely and did not know anyone else in the area. On August 18, 1993, Fahy and Kancilia met at a bar and had several drinks. Kancilia suggested that Fahy accompany him to his office for a full-body massage. The two went to Kancilia's office and engaged in sex. Following that encounter, Kancilia asked Fahy to change her appointment times to the last appointment of the day so no one else would be in the office. Over the next year (August 1993 to August 1994), Kancilia and Fahy engaged in sex in his office approximately once every two weeks. Fahy expressed a desire to end their relationship on several occasions but Kancilia persuaded her to continue. In particular, Kancilia told Fahy several times: "Well, I'll just remember that [i.e., Fahy's interest in ceasing the sexual relationship] next time you have a migraine." Id. at 1133. Kancilia also disparaged Fahy's idea of seeking marital counseling with her husband, stating that such counseling was a "waste of time." Id. at 1130. At Kancilia's urging,

9

Fahy also worked in his office for a short time. According to Fahy, she believed she was in love with Kancilia and he expressed his alleged love for her.

On or about August 25, 1994, Pearson, Fahy, and Kancilia met at a bar for a drink (Pearson and Fahy, who met at Kancilia's office, had struck up a friendship). After Kancilia left, Fahy revealed to Pearson that she was having a relationship with Kancilia and was considering leaving her husband. The following day, Pearson revealed to Fahy that she had been having sex with Kancilia for several months. Fahy and Pearson decided they should "stop" Kancilia because he possibly was engaging in sexual relations with other patients. Id. at 880.

Pearson left her employment with Kancilia and filed for unemployment. Kancilia disputed her unemployment claim, misrepresented her salary to the unemployment office, and incorrectly reported her income to the Internal Revenue Service. Although Pearson secured other full-time employment in late 1994, she alleged that the debts she incurred while unemployed forced her to file for bankruptcy.

Following the revelation of her affair with Kancilia, Fahy and her husband divorced and filed for bankruptcy. Fahy also sought psychiatric help and ultimately moved with her children to Nebraska.

The jury in the underlying action found in favor of Pearson and Fahy on each of their claims against Kancilia. The judgment recounts in detail each of the jury's findings:

> 1. On the claims for negligence of a chiropractor, the jury found for the Plaintiff, Michele R. Pearson, and against the Defendant, William E.

10

Kancilia, and awarded economic damages of $12,685 and non-economic damages of $125,000. The jury found the Plaintiff to be 25% negligent and the Defendant to be 75% negligent. The Defendant's pro rata share of liability for the above damages is $9,513.75 in economic damages and $93,750 in non-economic damages.

On the claims for negligence of a chiropractor, the jury found for the Plaintiff, Denise L. Fahy, and against the Defendant, William E. Kancilia, and awarded economic damages of $4,400, and non-economic damages of $225,000. The jury found the Plaintiff to be 20% negligent and the Defendant to be 80% negligent. The Defendant's pro rata share of liability for the above damages is $3,520 in economic damages and $180,000 in non-economic damages.

2. On the claim for invasion of privacy, the jury found for the Plaintiff, Michele R. Pearson, and against the Defendant, William E. Kancilia, and awarded non-economic damages of $100,000 and punitive damages of $100,000.

3. On the claims for extreme and outrageous conduct, the jury found for the Plaintiff, Michele R. Pearson, and against the Defendant, William E. Kancilia, and awarded non-economic damages of $50,000 and punitive damages of $50,000.

On the claims for extreme and outrageous conduct, the jury found for the Plaintiff, Denise L. Fahy, and against the Defendant, William E. Kancilia, and awarded non-economic damages of $50,000 and punitive damages of $50,000.

Id. at 503.

Fahy and Pearson concede that the insurance policies Kancilia had with NCMIC expressly exclude coverage for any of the non-economic or punitive damages awarded in the underlying action. Thus, the only coverage issue before us is whether the economic damages obtained by Fahy and Pearson against Kancilia in connection with their "negligence of a chiropractor" claims fall within the scope of the policies. For the reasons that follow, we conclude that the policies do not provide coverage for those damages.

11

As noted, both policies expressly provide coverage only for injuries "caused by accident arising out of the rendering of or failure to render to a patient . . . professional services." App. at 506.[2] Pearson and Fahy fail, in our view, to convincingly explain how their claims against Kancilia for "negligence of a chiropractor," and their related injuries, fall within the scope of this coverage. Indeed, after reviewing the transcript of the underlying proceedings, we conclude the claims by Pearson and Fahy against Kancilia for "negligence of a chiropractor" resulted from intentional conduct on Kancilia's part, i.e., his decision to violate his code of ethics and professional norms and seek a sexual relationship with women who were (at least initially, in the case of Pearson) his patients.[3] In other words, we conclude that Kancilia's decision to pursue a sexual relationship with each woman was not "accidental."

In addition to limiting coverage to "accidents" arising out of the provision of professional services, both policies also expressly exclude coverage for injuries arising out of "sexual assault or sexual impropriety."[4] Here, Pearson's and Fahy's negligence

---

[2] The second policy is worded slightly different but the general language and intent of the two policies are substantially similar.

[3] The jury instructions in the underlying action stated in pertinent part that "[a] chiropractor is negligent when the chiropractor does an act which reasonably careful chiropractors would not do." App. at 626.

[4] The language of the two policies differs slightly on this point. The first policy defines the term "injury" to exclude "claims of . . . sexual assault or impropriety." App. at 506. The second policy excludes from coverage an injury "resulting in whole or in part from . . . sexual impropriety; sexual intimacy, or assault." Id. at 512.

12

claims against Kancilia clearly resulted from sexual impropriety on the part of Kancilia, i.e., Kancilia's decision to deviate from professional norms and seek sexual relationships with the two women.[5]

Finally, we reject Pearson's and Fahy's attempt to recast their negligence claims against Kancilia in order to bring them within the scope of the policies' coverage. Throughout these federal proceedings, Pearson and Fahy have alleged that Kancilia failed to properly diagnose, treat, and/or refer both of them. For example, Fahy now alleges that Kancilia failed "to diagnose her condition of psychological problems that were created in her marriage" and failed to refer her "and her husband to marriage counseling." App. at 1817. A review of the transcript of the underlying trial, however, belies Pearson's and Fahy's characterization of the claims tried in state court. As outlined above, the state trial focused exclusively on Kancilia's inappropriate sexual conduct. The only expert testimony presented by the plaintiffs regarding their negligence claims was that of Richard Bergeron, a chiropractor licensed in Colorado. Bergeron testified that it is a

_____

[5] Pearson and Fahy argue "this was not just a sexual impropriety case," noting the state court expressly prevented them from using the terms "sexual harassment" and "sexual predator" during their case in chief. Aplt. Br. at 41. The evidentiary rulings cited by Pearson and Fahy, however, are red herrings. The concern of the state court was that the terms "sexual harassment" and "sexual predator" had specific meanings under the law. Because Pearson and Fahy had not alleged specific claims for "sexual harassment" (i.e., under Title VII or Colorado law) against Kancilia, and because there was no assertion that Kancilia was a "sexual predator" under the law, the court simply prohibited use of those phrases. Notwithstanding those rulings, however, a review of the trial record indicates the case revolved around Kancilia's sexual misconduct with Pearson and Fahy.

violation of the ethical standards applicable to Colorado chiropractors for a chiropractor to have sexual relations with a patient. Finally, during closing arguments, the attorney for Pearson and Fahy told the jury:

> The fact in this case that I think is crucial for you to decide is did or did not Dr. William Kancilia engage in sex with Denise Fahy and Michele Pearson; I want to start the analysis of this with that fact. And if you find it to be so, then I believe, as the Judge has instructed you, that he has violated his obligations and he's negligent as a chiropractor.

Id. at 1722.

*Entitlement to evidentiary hearing*

Pearson and Fahy contend the district court erred in granting summary judgment in favor of NCMIC because it looked solely to the language of the policies at issue and the evidence presented in the underlying trial. In support of their contention, Pearson and Fahy assert "the state court jury trial was not a trial for coverage under the" policies at issue. Aplt. Br. at 16. Further, they assert that Colorado law, namely Bohrer, 965 P.2d 1258, entitles them to a separate evidentiary hearing on the coverage issue and affords them the right to present additional evidence to establish coverage. Thus, Pearson and Fahy contend, the district court should not have discounted the expert opinion evidence attached to their summary judgment motion (but not part of the evidence introduced in the underlying trial).

Pearson and Fahy misread Bohrer. In Bohrer, a young woman (Bohrer) obtained a civil judgment against her former youth minister on claims of outrageous conduct and

14

breach of fiduciary duty. After she obtained the judgment, Bohrer filed a garnishment proceeding against the insurer for the minister's employers. Although the state trial court and the Colorado Court of Appeals rejected her garnishment claim, the Colorado Supreme Court reversed and remanded, concluding the insurance policies at issue provided coverage for a portion of the judgment. In reaching this conclusion, the court reviewed the record from the underlying case and noted that the minister had counseled Bohrer (who was then a child) for 21 months before engaging in inappropriate sexual contact with her. The court further noted, again based on the evidence presented in the civil trial, that during the initial 21-month counseling period, the minister had confided in Bohrer regarding his personal problems, informed Bohrer that she was a bad person, criticized her mother and other people close to her, and effectively left her "feeling isolated and dependent upon him." 965 P.2d at 1260. On the basis of this evidence, the court concluded the judgment against the minister was based on both "his counseling and sexual misconduct activities," and that, "[b]ecause the counseling relationship predated and continued for a period of time prior to the sexual conduct," the "causes [we]re separable." 965 P.2d at 1261. The court remanded the case with instructions to hold a hearing to "determine how the jury's compensatory award against [the minister] [should] be allocated between the period of counseling activities and the period of excluded sexual conduct." Id.

Contrary to the suggestions of Pearson and Fahy, nothing in Bohrer indicates that a

15

court faced with deciding whether a civil judgment falls within the scope of a particular insurance policy must ignore the evidence presented in support of the civil judgment. Nor does Bohrer require a court in such circumstances to consider evidence not presented in support of the civil judgment. The sole purpose of the hearing ordered in Bohrer was to apportion the damages awarded by the jury between two types of conduct, both of which were alleged and proved at trial. Thus, Pearson and Fahy are incorrect in suggesting that the district court in this case, in determining coverage, violated Bohrer by looking only to the record in the underlying action. Likewise, Pearson and Fahy are incorrect in suggesting the district court was obligated to hold a "Bohrer hearing." Aplt. Br. at 40.

*Effect of district court decision*

Pearson and Fahy assert that the district court "was in effect acting as an appellate court" and "effectively reversed the state court jury's verdict without a showing by [NCMIC] that the negligence found by the jury was arbitrary, capricious, without a factual basis or that the jury was swayed by passion or prejudice." Aplt. Br. at 38.

We do not read the district court's ruling as a reversal of the verdict obtained in state court. Contrary to the arguments made by Pearson and Fahy, the district court in this case reviewed the record in the underlying proceedings to determine whether the policies at issue provided coverage for part of the judgment obtained by Pearson and Fahy. Although the district court concluded the policies did not provide coverage for the judgment, it in no way "reversed" the underlying verdict. Indeed, the district court's

opinion is true to that verdict in that it fairly and accurately described the nature of the evidence that resulted in the verdict.

*Refusal to stay proceedings*

Pearson and Fahy contend the district court erred in refusing to stay this federal diversity action pending the outcome of their state court garnishment action (which was filed approximately four months after this action and was ultimately stayed by the state district court pending outcome of this action). We review for abuse of discretion a district court's denial of a motion to stay proceedings. Reed v. Bennett, 312 F.3d 1190, 1193 n.1 (10th Cir. 2002)

Although the district court did not explain its reasoning in denying Fahy's and Pearson's motion to stay, we conclude there was no abuse of discretion. Among the various factors relevant to a motion for stay of proceedings are

> those of comity, the extent of disputed factual (as opposed to legal) issues involved, adequacy of relief available in stat[e] court, avoidance of maneuvers designed to throw sand into judicial machinery, the order in which the courts obtained jurisdiction, the need for comprehensive disposition of litigation, and the desirability of avoiding piecemeal litigation.

State Farm Mut. Auto. Ins. Co. v. Scholes, 601 F.2d 1151, 1155 (10th Cir. 1979). Here, most, if not all, of these factors support the district court's decision. For example, in addition to the fact that the district court in this case obtained jurisdiction over this proceeding prior to Fahy and Pearson filing their garnishment action, it is obvious that more complete and comprehensive relief could be obtained in this federal action than in

17

the state garnishment action.

The judgment of the district court is AFFIRMED.

Entered for the Court

Mary Beck Briscoe
Circuit Judge
