**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 14 2002**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

SCOTT'S LIQUID GOLD, INC., a
Colorado corporation,

Plaintiff-Appellee,

v.

No. 00-1258

LEXINGTON INSURANCE
COMPANY, a Massachusetts
corporation,

Defendant-Appellant.

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 97-B-107)**

---

Steven W. Black, (Wiley E. Mayne, with him on the brief), Holland & Hart, LLP, Denver, Colorado, for Plaintiff-Appellee.

W. David Campagne, Sinnott, Dito, Moura & Puebla, P.C., San Francisco, California, (Kenneth Sumner, Sinnott, Dito, Moura & Puebla, P.C., San Francisco, California; Alan Epstein, Chris Mattison, Hall & Evans, L.L.C., Denver, Colorado, with him on the briefs), for Defendant-Appellant.

---

Before **TACHA**, Chief Judge, **ANDERSON**, and **MURPHY**, Circuit Judges.

---

**MURPHY**, Circuit Judge.

## I. INTRODUCTION

Plaintiff-Appellant Lexington Insurance Company ("Lexington") appeals the district court's denial of its motion for summary judgment and grant of partial summary judgment to Defendant-Appellee Scott's Liquid Gold-Inc. ("Scott's"). The district court ruled that Lexington had a duty to indemnify Scott's for its liability relating to releases of environmental contaminants. Lexington also appeals the district court's award of attorney fees to Scott's. This court has jurisdiction under 28 U.S.C. § 1291. We **affirm** the district court's grant of partial summary judgment to Scott's but **reverse** the award of attorney fees.

## II. BACKGROUND

Scott's manufactures wood cleaners and preservatives. From 1955 to 1991, it used 1,1,1-tricholoroethane (TCA) as an ingredient in these products. In 1970, Scott's began manufacturing its products at a plant approximately one mile south of the Rocky Mountain Arsenal in Colorado. Environmental consultants hired by Scott's detected TCA in the soil and groundwater at Scott's facility in 1989. The parties do not dispute that Scott's production activities contributed to the soil and groundwater contamination. Sometime prior to 1989, TCA had been released into the soil and groundwater, creating a plume of contamination which flowed northwest toward the Arsenal. The parties dispute the timing of the TCA release into the soil and groundwater.

In the 1980s, the United States Environmental Protection Agency discovered contaminants in drinking wells owned by South Adams County Water and Sanitation District ("SACWSD"). The wells are near the Arsenal and Scott's facility. The United States Army, owner of the Arsenal, participated in the investigation and found TCA and other contaminants in the drinking wells and in groundwater flowing toward the Arsenal. The Army paid over $25 million to investigate and remediate the contamination. In September 1994, the United States sued Scott's for contribution to the cleanup costs. Pursuant to a settlement agreement, Scott's paid $6 million to the United States and $200,000 to SACWSD.

Scott's sought reimbursement of these costs from its insurers, one of which was Lexington. Scott's held a Lexington excess insurance policy for the period December 1, 1980 to December 1, 1981. Relevant to this appeal is language in the "Insuring Agreements" and "Definitions" portions of the policy. The policy provided as follows:

## INSURING AGREEMENTS

```
I. Coverage – To pay on behalf of the Insured
the ultimate net loss in excess of the
retained limit . . . which the Insured shall
become legally obligated to pay as damages by
reason of the liability imposed upon the
Insured by law . . . because of –
. . . ,

(b) Property Damage,
```

-3-

> . . . ,
>
> as defined herein and caused by or arising
> out of an occurrence.
>
> . . . .
>
> **IV. Territory – Policy Period –** This policy
> applies only to occurrences happening
> anywhere during the policy period.
>
> **DEFINITIONS**
>
> . . . .
>
> **8. Occurrence –** With respect to . . .
> Property Damage the term "Occurrence" means
> an event, including continuous or repeated
> exposure to conditions, which result [sic] in
> . . . Property Damage neither expected nor
> intended from the standpoint of the Insured.
> All such exposure to substantially the same
> general conditions shall be deemed one
> occurrence.

Lexington refused to indemnify Scott's or pay Scott's legal expenses incurred in the Army suit, and Scott's sued in Colorado state court for breach of contract. The suit was later removed to federal court.

Both sides moved for summary judgment on coverage. Lexington argued that the policy language dictated that coverage arose only if the property damage suffered by the Army or SACWSD happened during the policy period, December 1, 1980 to December 1, 1981. Lexington contended coverage was not triggered since there was no proof that the plume had migrated to the Arsenal or the SACWSD wells during the policy period. Scott's argued the contract did not

-4-

require such proof. According to Scott's, the definition of "occurrence" merely required that the event ultimately resulting in property damage happen during the policy period, not that the property damage also occur during the period.

The district court agreed with Scott's and ruled that the continuous release of TCA into the soil and groundwater beneath Scott's facility constituted an occurrence triggering coverage. The district court determined it was undisputed that TCA releases into the soil and groundwater started before 1980 and continued through 1981. The district court also ruled that Scott's was entitled to attorney fees incurred in the coverage litigation. In so doing, it recognized the general rule that attorney fees are not recoverable in a contract action absent some statute, court rule, or contract provision to the contrary. *See Bernhard v. Farmers Ins. Exch.*, 915 P.2d 1285, 1287 (Colo. 1996) (en banc). The district court, however, concluded that the policy obligated Lexington to pay Scott's reasonable attorney fees incurred in an action to compel Lexington to provide coverage. The district court reasoned that its own decision in *Flannery v. Allstate Insurance Co.* interpreted Colorado law to require the insurer to pay attorney fees under similar contract language. *See Flannery*, 49 F. Supp. 2d 1223, 1232-33 (D. Colo. 1999) (discussing *Allstate Ins. Co. v. Robins*, 597 P.2d 1052, 1052-53 (Colo. Ct. App. 1979)).

## III. STANDARD OF REVIEW AND APPLICABLE LAW

Federal jurisdiction is based on diversity. The district court applied the substantive law of the forum state, Colorado. *See Vanover v. Cook*, 260 F.3d 1182, 1186 (10th Cir. 2001). Neither party challenges the propriety of the application of Colorado law. *See Webco Indus., Inc. v. Thermatool Corp.*, 278 F.3d 1120, 1126 (10th Cir. 2002) (applying Michigan law after parties agreed to its applicability).

We review a district court's decision on summary judgment *de novo*, applying the same standard as the district court. *Hirase-Doi v. U.S. West Communications, Inc.*, 61 F.3d 777, 781 (10th Cir. 1995). Summary judgment is proper when the pleadings, discovery materials, and affidavits submitted by the parties demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court's function at the summary judgment stage is not to weigh evidence but merely decide whether there is a genuine issue of fact for trial. *TPLC, Inc. v. United Nat'l Ins. Co.*, 44 F.3d 1484, 1489 (10th Cir. 1995). An issue of fact is genuine when the evidence is such that a factfinder could resolve the issue in either party's favor. *Bennett v. Quark, Inc.*, 258 F.3d 1220, 1224 (10th Cir. 2001).

The district court based the attorney fees award on its interpretation of the insurance contract and principles of Colorado law. While this court generally reviews a district court's award of attorney fees for abuse of discretion, we review the underlying legal analysis *de novo*. *Towerridge, Inc. v. T.A.O., Inc.*, 111 F.3d 758, 765 (10th Cir. 1997).

## IV. COVERAGE TRIGGER

In Colorado, a contract is interpreted according to the plain and ordinary meaning of its language. *Chacon v. Am. Family Mut. Ins. Co.*, 788 P.2d 748, 750 (Colo. 1990) (en banc). A court should enforce the insurance contract as written, unless an ambiguity exists. *Ballow v. PHICO Ins. Co.*, 875 P.2d 1354, 1359 (Colo. 1993) (en banc). The meaning of the term "occurrence" as defined in *this* contract is at the heart of the coverage dispute. Lexington points out, correctly, that an occurrence must happen during the policy period for coverage to attach. Lexington argues, however, that before an occurrence can exist property damage must also exist. Accordingly, Lexington submits that, since the Army and SACWSD suffered no property damage from the TCA plume during the policy period, the plume was not an occurrence that existed within the policy period. We disagree.

The definition of occurrence in the Lexington policy is "an event, including continuous or repeated exposure to conditions, which result [sic] in . . . Property

Damage." The definition, unlike that used in many policies, contains no express requirement that property damage be manifest within a certain time frame in order for the event to qualify as an occurrence. *Cf. Browder v. United States Fid. & Guar. Co.*, 893 P.2d 132, 134 (Colo. 1995) (en banc) (interpreting a policy which defined occurrence as "an accident . . . which results, *during the policy period*, in . . . property damage" (emphasis added)); *Fire Ins. Exch. v. Bentley*, 953 P.2d 1297, 1300 (Colo. Ct. App. 1998) (same); Robert E. Keeton & Alan I. Widiss, Insurance Law 595 (practioner's ed. 1988) (discussing the definition of occurrence common in standard automobile insurance policy forms: an accident "which results, *during the policy period*, in . . . property damages" (emphasis added)). Without such a temporal qualifier, the plain meaning of the definition is that an occurrence exists whenever an event happens that will result in property damage, regardless of when the property damage occurs.

Lexington argues that under Colorado law property damage within the policy period is a prerequisite to coverage. *See Browder*, 893 P.2d 132; *Samuelson v. Chutich*, 529 P.2d 631 (Colo. 1974) (en banc). Contrary to Lexington's assertion, *Browder* and *Chutich* are not controlling. Both involve very different policy language than that at issue in this case.

In *Browder*, the policy defined "occurrence" as "an accident . . . which results, *during the policy period*, in . . . property damage." 893 P.2d at 134

-8-

(emphasis added). Thus, unlike the policy at issue in this case, the *Browder* policy expressly required property damage to occur during the policy period.

The policy in *Chutich* read, "This policy applies only to *accidents* which occur during the policy period." 529 P.2d at 633 (emphasis added). In deciding that coverage was triggered only if property damage happened during the policy period, the Colorado Supreme Court quoted with approval an Arizona case holding that the word 'accident' "clearly implies a misfortune with concomitant damage to a victim." *Id.* at 635 (quoting *Century Mut. Ins. Co. v. S. Ariz. Aviation, Inc.*, 446 P.2d 490, 492 (Ariz. Ct. App. 1968)); *see also Carroll v. CUNA Mut. Ins. Soc'y*, 894 P.2d 746, 753 (Colo. 1995) (en banc) (holding that "[a]n unanticipated or unusual *result* flowing from a commonplace cause may be an accident" (emphasis added)). Thus, unlike an "occurrence" or an "event," an "accident" cannot exist without some form of damage. The broad term "event" in the occurrence definition of the Lexington policy does not appear to have been directly addressed in the Colorado cases.[1] The plain meaning of such a broad

---

[1] Colorado's body of insurance caselaw deals overwhelmingly with policies which define an occurrence using the narrower term "accident." *See, e.g., Browder v. United States Fid. & Guar. Co.*, 893 P.2d 132, 134 (Colo. 1995) (en banc); *Hecla Mining Co. v. N.H. Ins. Co.*, 811 P.2d 1083, 1086 (Colo. 1991) (en banc); *Fire Ins. Exch. v. Bentley*, 953 P.2d 1297, 1300 (Colo. Ct. App. 1998); *Employers' Fire Ins. Co. v. W. Guar. Fund Servs.*, 924 P.2d 1107, 1108-09 (Colo. Ct. App. 1996); *M.L. Foss, Inc. v. Liberty Mut. Ins. Co.*, 885 P.2d 284, 285 (Colo. Ct. App. 1994); *Am. Employer's Ins. Co. v. Pinkard Constr. Co.*, 806 P.2d 954, 955 (Colo. Ct. App. 1990).

definition, coupled with the tendency of Colorado courts to interpret "occurrence" against the insurer, compel the conclusion that an event which eventually results in property damage should be deemed an occurrence under this contract. *See, e.g., Bentley*, 953 P.2d at 1301 ("An 'occurrence' is to be broadly construed against the insurer."). If that event happens during the policy period then coverage is triggered, regardless of when the property damage becomes manifest.

Thus, if contamination of the soil and groundwater in this case happened during the policy period, December 1, 1980 to December 1, 1981, coverage is triggered, regardless of when the TCA plume crossed the Army and SACWSD property. The district court concluded the only evidence presented demonstrated that contamination of the groundwater underneath Scott's facility began prior to 1980 and continued through the policy period. We agree that no genuine issue of fact exists as to release during the policy period.

Scott's offered the affidavits of two experts in support of its motion for partial summary judgment. One expert, Dr. Chirlin, stated in his affidavit that, according to his analysis of groundwater flow and velocity, the TCA plume passed the arsenal boundary by early 1981. Chirlin further opined that "in order for the groundwater to have traveled the distance from Scott's facility to the Arsenal boundary by early 1981, it must have been contaminated by events at Scott's beginning prior to 1976." Chirlin also concluded that, based on the length

of the plume, TCA had continued to leach into the groundwater beneath Scott's facility through at least 1991. The other expert, Mr. Folkes, stated in his affidavit that "TCA more likely than not began to seep into the soil between 1971 and 1976, and was present in the soil through 1980-81, into later years. Contamination of the groundwater also occurred continuously during these years."

In opposition, Lexington offered excerpts from the depositions of Folkes and Chirlin in both this coverage case and the underlying suit brought by the Army against Scott's. In Chirlin's depositions, he stated that he did not actually know when contamination started at Scott's facility. In Folkes' deposition in the underlying case, he stated that "I don't know when [TCA] first became located in the groundwater below the Scott's facility." Lexington contends these statements indicate that contamination could have occurred after the policy period and thus create a genuine issue of material fact.

In response to the specific question whether they *actually knew* the earliest date of contamination, both experts responded no. A thorough reading of Chirlin's and Folkes' deposition testimony, however, reveals that neither disclaimed having an *opinion* as to the date of contamination. Both experts used groundwater flow velocity estimates and the known date of contamination of other areas to infer the start of contamination at Scott's facility. Because these calculations involved estimates of groundwater flow velocity and numerous other

variables, it would be impossible for each expert to *know* precisely the start date of contamination. Yet, the calculations did permit both experts to conclude that more likely than not the contamination began before and continued through the policy period. Lexington cites no evidence conflicting with these opinions or the underlying calculations. Thus, based on the evidence presented, a factfinder could only find for Scott's. Summary judgment for Scott's on the coverage issue is therefore proper.

## V. ATTORNEY FEES

Scott's recognizes that in the absence of a statute, court rule, or contract provision to the contrary, attorney fees should not be awarded in Colorado. *Bernhard*, 915 P.2d at 1287. It argues, however, that the following language in the insurance contract mandates the award of attorney fees incurred in this coverage action:

```
             INSURING AGREEMENTS
.   .   .   .

II.   Defense, Settlement, Supplementary
Payments — Solely as respects occurrences
covered under this policy . . .  but not
covered under the underlying insurance . . .
or under any other underlying insurance
collectible by the Insured, the Company
shall:

        .   .   .   ;

        (c) reimburse the Insured for all
            reasonable expenses incurred at the
```

-12-

```
Company's request, (including actual
loss of wages or salary, but not
loss of other income, not to exceed
$75 per day) because of his
attendance at hearings or trials at
such request.
```

The district court relied upon its previous decision in *Flannery*, which in turn relied upon *Allstate Insurance Co. v. Robins*, in which the Colorado Court of Appeals determined that language similar to section II(c) required the insurer to pay the insured attorney fees incurred in a suit for coverage. *See Robins*, 597 P.2d 1052, 1052-53 (Colo. Ct. App. 1979).

Even if the "at the Company's request" language of section II(c) obligates Lexington to pay Scott's attorney fees incurred in a coverage action brought by Scott's, that duty, like the other duties under section II, is triggered only when an occurrence is (1) covered under the Lexington policy *and* (2) not covered by the underlying insurance agreements. The parties dispute whether Scott's underlying insurance covered the TCA plume. Lexington argues that since Scott's exhausted its underlying insurance policies, the TCA plume must have been covered by those policies. Scott's contends that the phrase "not covered" is susceptible to two readings. First, it may mean that the event in question does not satisfy the underlying policies' criteria for a covered peril. Second, it may also mean that though the event is an occurrence that would otherwise be covered, it is not an insured event because the underlying policies have been exhausted. In other

-13-

words, if the limits of the underlying policies have been reached, those policies cannot be said to cover the occurrence. Scott's argues that "not covered" is thus ambiguous and should be construed against Lexington.[2] We disagree.

The purpose of the "not covered" clause "is to provide for risks not insured against by the underlying insurances." *See Unigard Mut. Ins. Co. v. Mission Ins. Co.*, 907 P.2d 94, 99 (Colo. Ct. App. 1994). In *Arcement v. Norman Industries, Inc.*, the Fifth Circuit rejected the argument that an occurrence was not covered by the underlying insurance policies simply because the insured had let those policies lapse. 652 F.2d 395, 397 (5th Cir. Unit A June 1981) (per curiam), *cited with approval in Unigard*, 907 P.2d at 99. The Fifth Circuit reasoned that "not covered" referred to events not meeting the definition of a covered event in the underlying insurance policies, not to a situation in which an event was a covered event but the underlying insurers did not indemnify because the policies had lapsed. *Id.* Similarly, "not covered" in the Lexington policy plainly refers to an event which does not meet the definition of a covered event in the underlying policies.[3] There is no dispute that the TCA plume was a covered event under the

---

[2] Scott's also contends that Lexington never argued below that its duties under section II were not triggered. We have reviewed the record and conclude that Lexington sufficiently preserved the issue for appeal.

[3] Our agreement with the Fifth Circuit is limited to its holding that "not covered" means an event does not meet the underlying policies' definitions of a covered event. We express no opinion on whether the lapsing of underlying insurance polices would trigger the duties enumerated in section II or similar

definition employed by Scott's underlying insurance policies. Scott's cites no evidence to the contrary and, indeed, stipulated that its other insurers paid $5,920,000 of its TCA plume liability. Scott's underlying insurers paid precisely because the plume was a covered event under those policies.

If the parties had intended to obligate Lexington to reimburse Scott's for attorney fees when Scott's exhausted its underlying insurance, they could have easily specified that exhaustion of the underlying insurance policies renders an occurrence "not covered." *See, e.g., Nat'l Union Fire Ins. Co. v. Travelers Ins. Co.*, 214 F.3d 1269, 1272 (11th Cir. 2000) (interpreting policy that included the provision: "This section shall also apply to occurrences not covered by any underlying insurance due to exhaustion"); *Hocker v. N.H. Ins. Co.*, 922 F.2d 1476, 1481-83 (10th Cir. 1991) (interpreting insurance contract expressly providing excess insurer had duty to defend when underlying insurance exhausted). This court will not reach a strained interpretation of a contract, especially when the interpretation runs counter to the obvious intentions of the parties. *See Allstate Ins. Co. v. Starke*, 797 P.2d 14, 17-18 (Colo. 1990) (en banc). Thus, Lexington is not obligated by section II(c) to reimburse Scott's for attorney fees incurred in this coverage action. Because Scott's references no other language in the contract entitling it to attorney fees, the award was contrary to Colorado law.

---

contractual language.

## VI. CONCLUSION

The district court's grant of summary judgment to Scott's on the question of coverage is **AFFIRMED**.  The district court's award of attorney fees is **REVERSED**.  The case is remanded for further proceedings consistent with this opinion.