**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**March 17, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

PAUL F. HOFER,

       Plaintiff - Appellant,

v.

UNUM LIFE INSURANCE
COMPANY OF AMERICA,

       Defendant - Appellee.

No. 04-3430

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. NO. 02-CV-02079-GTV)**

---

Richard T. Merker (James L. MowBray with him on the briefs), Wallace
Saunders, Austin Brown & Enochs, Chartered, Overland Park, Kansas, for
Plaintiff - Appellant.

Morris J. Nunn (Jennifer J. Coleman with him on the brief), Stinson Morrison
Hecker LLP, Kansas City, Missouri, for Defendant - Appellee.

---

Before **LUCERO,** Circuit Judge, **BRORBY,** Senior Circuit Judge, and **HARTZ,**
Circuit Judge.

---

**HARTZ**, Circuit Judge.

---

On August 28, 1995, UNUM Life Insurance Company of America denied Dr. Paul Hofer's claim for disability benefits. He submitted a second claim on September 22, 2001, which was denied on December 31 of that year. On January 15, 2002, Dr. Hofer filed this diversity suit in the United States District Court for the District of Kansas. *See* 28 U.S.C. § 1332 (granting diversity jurisdiction). Six months later UNUM reversed course and agreed to pay benefits and refund premiums covering January 1, 1998, through October 1, 2001. It also paid benefits due from October 1, 2001, to October 31, 2002; but in making these latter payments, it initially "reserved[d] the right to enforce any and all provisions of the Policy and to seek to recoup the payments if it deems that is warranted." Aplt. App. Vol. II at 519-20. That reservation was withdrawn in February 2003, shortly after Dr. Hofer underwent further medical tests. The parties eventually stipulated that since March 15, 1995, Dr. Hofer had been sufficiently disabled to be entitled to partial benefits under the policy, but that any claims that accrued before January 15, 1997, were barred by the statute of limitations. In an admirable display of their attorneys' professionalism, the parties submitted their remaining disputes to the district court upon stipulated facts.

By order dated January 29, 2004, the district court held that (1) UNUM did not breach its contract with Dr. Hofer when it denied benefits in 1995; (2) UNUM breached its contract when it denied benefits on December 31, 2001, and

Dr. Hofer was therefore entitled to certain prejudgment interest, but only from that date forward; (3) in calculating Dr. Hofer's benefits, UNUM had properly interpreted the unambiguous definition of the term *prior net income* in the insurance policy; and (4) Dr. Hofer was not entitled to certain "automatic" benefit increases for which he had paid additional premiums after the onset of his disability. In addition, the district court awarded Dr. Hofer approximately half the attorney fees he requested. Dr. Hofer appeals each of these rulings. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

**I. Denial of Benefits in 1995**

The district court rejected Dr. Hofer's claim that he was improperly denied benefits when he first submitted a claim in 1995. In essence, the court ruled that Dr. Hofer had not proved that he had submitted sufficient information to UNUM to establish his claim at that time. The court's decision rested on the parties' stipulated facts. When the district court makes nondiscretionary legal determinations based on stipulated facts, our review is de novo. *FDIC v. Kansas Bankers Sur. Co.*, 963 F.2d 289, 292 (10th Cir. 1992).

The following facts are among those stipulated: On March 15, 1995, Dr. Hofer, a dentist, went to see Dr. Lynn Ketchum about pain he was experiencing in his forearms and hands. Dr. Ketchum made an initial diagnosis of bilateral flexor tenosynovitis, carpal tunnel syndrome, and overuse syndrome, or

cumulative trauma disorder. Following Dr. Ketchum's advice, Dr. Hofer decreased his work schedule by 25%. He had several follow-up visits, and was referred to specialists for additional diagnosis and treatments. By August 4, 1995, when Dr. Hofer visited Dr. Ketchum for a fourth time, he was working about three days a week and his condition was slowly improving.

Dr. Hofer was insured under a disability-income policy and a business-overhead policy from UNUM. On June 21, 1995, he submitted a claim for residual-disability benefits under the disability-income policy. (He also submitted a claim under the overhead policy, but that claim is no longer at issue, except with respect to prejudgment interest.) *Residual disability* is defined in the policy as a disability that "restrict[s] the insured's ability to perform the material and substantial duties of his occupation . . . for as long a time as the insured customarily performed them before the injury or sickness; or . . . as effectively as the insured customarily performed them before the injury or sickness." Aplt. App. Vol. I at 103, ¶ 66.

The disability-income policy contains the following provision governing submission of a claim:

> To make a claim under this policy, the following steps must be taken:
>
> 1. give Notice of Claim (someone must notify UNUM that disability has started as defined in this policy);

2. file Proof of Loss (the insured, or someone acting on the insured's behalf, and the insured's attending physician must complete and return the claim form provided by us);

3. promptly complete and return any other forms UNUM requires; and

4. the insured undergoes a medical examination by a specialist appropriate for the condition or a personal interview as often as UNUM reasonably requests while the claim is pending. UNUM reserves the right to select the examiner. UNUM will pay for the examination.

We (UNUM) will evaluate the claim and either:

1. pay the benefits specified in the policy; or

2. notify the insured and any Loss Payee that benefits are not payable and why. If UNUM needs more information, UNUM will tell the insured and any Loss Payee what UNUM needs.

*Id*. at 106, ¶ 84. The policy also provides that UNUM "will not pay any benefit until we have sufficient Proof of Loss." *Id*. at 107, ¶ 85.

To support Dr. Hofer's claims, Dr. Ketchum submitted to UNUM an attending physician's statement, along with "certain medical records." *Id*. at 109, ¶ 116. The record in this case, however, does not reveal what information these documents contained. On August 21, 1995, Dr. Nancy Ball, an agent of UNUM, contacted Dr. Ketchum to discuss Dr. Hofer's claims.

Dr. Hofer's claim was denied on August 28, 1995, in a letter from UNUM which states:

Thank you for your kind patience and cooperation while we have been administering your claim for disability income benefits. Based on a thorough review of the information contained in your file and

the applicable terms of your policy, disability benefits have been denied.

The above-noted policies state:

> *Residual disability* and *residually disabled* mean:
>
> 1. injury or sickness does not prevent you from engaging in your regular occupation, BUT does restrict your ability to perform the material and substantial duties of your regular occupation:
>
>> a. for as long a time as you customarily performed them before the injury or sickness; or
>> b. as effectively as you customarily performed them before the injury or sickness[; and]
>
> 2. you are receiving medical care from someone other than yourself which is appropriate for the injury or sickness. . . .

As you are aware, UNUM had requested and reviewed medical documentation pertaining to your illness. Based on a review of this documentation, questions arose as to the extent of impairment you were claiming. As a result, our Medical Director, Dr. Nancy Ball, spoke directly with your attending physician, Dr. Lyn [sic] Ketchum, on August 21, 1995.

According to UNUM's review and based on the lack of objective medical documentation, it is UNUM's determination your condition does not preclude you from performing the material and substantial duties of your occupation. Additionally, our Medical Director spoke with your attending physician, Dr. Ketchum, regarding your claim and concurs with UNUM's conclusion. Therefore, no benefits are payable under the terms of your policies.

UNUM and Dr. Ketchum discussed the possibility that electrodiagnostic testing and/or a thorough consultation through the Institute for the Rehabilitation of Disabled Dentists may assist you in gaining clarification of your current condition given the lack of objective data at this point to substantiate your claim.

-6-

Dr. Hofer, please understand that our decision has been based on a complete evaluation of the file as it has developed in your claim. Should there be any additional information which we are not aware of which you feel may have affected our decision, or if you have any questions regarding this decision, please call me at [this phone number].

Please be assured of our desire and readiness to be of prompt service to you in the future, whenever possible, within the provisions of your policies. If you disagree with our determination on the facts in your file as they have been presented, you may request our Quality Review Section review this decision by sending your request in writing to [this address].

*Id*. at 163-64 (ellipsis in original).

Dr. Hofer argues that this stipulated evidence establishes UNUM's breach. He contends that UNUM had all the information it needed to determine that he was disabled. We are not persuaded. Although UNUM no longer disputes that Dr. Hofer has in fact been eligible for benefits since March 15, 1995, nothing in the record shows exactly what information UNUM had when it denied Dr. Hofer's claim. As stated by the district court: "It is immaterial whether [Dr. Hofer] was restricted in his activities; if [Dr. Hofer] did not provide this information to [UNUM], then [UNUM] could not be in breach when it denied [Dr. Hofer's] claim." *Id*. Vol. II at 337. To be sure, there is evidence that Dr. Ketchum had told Dr. Hofer to reduce his work hours and that Dr. Hofer had done so. But there is no evidence that this information was ever communicated to UNUM. Indeed, a memorandum in UNUM's file memorializing the conversation between

Dr. Ketchum and UNUM's Medical Director states that Dr. Ketchum said only that Dr. Hofer should not work more than 40 hours per week, and that nothing Dr. Ketchum said "support[s] loss of work capacity." *Id*. Vol. I at 292. (The record does not indicate how many hours Dr. Hofer worked each week before developing his disability.)

Dr. Hofer points out that the parties stipulated that Dr. Ketchum submitted an attending physician's statement to UNUM before it denied his claim. But the parties did not stipulate to the contents of the statement, nor was a copy provided to the district court. The parties also stipulated that "certain medical records" were sent to UNUM before the claims were denied. *Id*. at 109, ¶ 116. But, again, the record does not show what information these medical records contained. We agree with the district court that "[t]here simply is no evidence in the record from which the court can conclude that [UNUM] knew in 1995 that Dr. Ketchum had told [Dr. Hofer] to reduce his working hours." *Id*. Vol. II at 338.

Dr. Hofer raises three other challenges to UNUM's denial of benefits. First, he claims that UNUM's denial letter applied the wrong standard for residual disability. He points to the fourth paragraph of the letter, which states that "your condition does not preclude you from performing the material and substantial duties of your occupation," *id*. Vol. I at 164, whereas the disability policy states that the standard for residual disability benefits is whether the condition restricts

the ability to perform the material and substantial duties of the person's occupation "for as long a time as the insured customarily performed them before the injury or sickness; or . . . as effectively as the insured customarily performed them before the injury or sickness," *id*. at 103, ¶ 66. But the second paragraph of the letter quotes the standard in full. The language relied upon by Dr. Hofer, which appears two paragraphs later, is apparently shorthand for the complete standard. In any event, as the district court observed, even if UNUM applied the wrong standard, that "does not alter the fact that [Dr. Hofer] has not shown that [UNUM] possessed information from which it could conclude that [he] was residually disabled." *Id*. Vol. II at 339.

Second, Dr. Hofer argues that if UNUM did not have enough information to make its determination, it had a duty to request more information. The policy states that once the claimant has properly submitted a claim, UNUM will either pay the benefits or "notify the insured and any Loss Payee that benefits are not payable and why. If UNUM needs more information, UNUM will tell the insured and any Loss Payee what UNUM needs." *Id*. Vol. I at 106, ¶ 84. This provision would prohibit UNUM from denying or delaying payment based on the absence of information that it knows the insured could provide if requested. It makes no sense, however, to read this obligation (namely, to request more information "if UNUM needs [it]") as requiring UNUM to request more information when the

information before it is definitive and it has no reason to know that contrary information exists. All UNUM could do in these circumstances was inform Dr. Hofer that it was open to receiving contrary information. And that is what it did. The denial letter invited Dr. Hofer to send any information "which we are not aware of which you feel may have affected our decision," and also invited Dr. Hofer to appeal the decision to UNUM's Quality Review Section. *Id.* at 164. We therefore agree with the district court that UNUM did not violate the "more information" provision when it denied Dr. Hofer's claims in 1995.

Finally, Dr. Hofer argues that once UNUM had rejected his claim, providing further proof would have been a useless act. *See Rosenbloom v. New York Life Ins. Co.*, 163 F.2d 1, 4-5 (8th Cir. 1947) ("[A] party is not required to do a useless, futile act. . . . [W]here failure of a party to perform a condition is induced by a manifestation to him by the other party that he will not substantially perform his own promise, performance of such condition is waived, and, therefore, excused."). If we had concluded that UNUM was in breach when it denied benefits, this argument might have merit. But UNUM denied benefits because Dr. Hofer had not fulfilled a condition precedent under the contract—namely, providing sufficient proof that he was disabled. UNUM in no way indicated that it would deny benefits regardless of the evidence of disability. On the contrary, it expressly invited Dr. Hofer to provide further proof of his

claimed disability. But Dr. Hofer delayed. According to the stipulated facts, no additional documents were sent after the 1995 denial until Dr. Hofer submitted his second claim on September 21, 2001. In short, UNUM did not breach its contract with Dr. Hofer when it denied his claim in 1995.

## II. Prejudgment Interest

The district court agreed with Dr. Hofer that UNUM breached its insurance contracts with Dr. Hofer when it rejected his second claim on December 31, 2001, because UNUM at that time "had adequate information to determine that [he] was disabled for all months preceding October 2001." Aplt. App. Vol. II at 353. It awarded prejudgment interest from December 31, 2001, until paid on benefits and premium refunds owed by UNUM. Dr. Hofer contends that interest should have accrued from the date he paid the premium or the date he was eligible for the benefit.

"Prejudgment interest in a diversity action is . . . a substantive matter governed by state law." *Webco Indus., Inc. v. Thermatool Corp.*, 278 F.3d 1120, 1134 (10th Cir. 2002). "Prejudgment interest [in Kansas] is governed by K.S.A. 16-201." *Miller v. Botwin*, 899 P.2d 1004, 1011 (Kan. 1995). That statute provides:

> Creditors shall be allowed to receive interest at the rate of ten percent per annum, when no other rate of interest is agreed upon, for any money after it becomes due; for money lent or money due on settlement of account, from the day of liquidating the account and

ascertaining the balance; for money received for the use of another and retained without the owner's knowledge of the receipt; for money due and withheld by an unreasonable and vexatious delay of payment or settlement of accounts; for all other money due and to become due for the forbearance of payment whereof an express promise to pay interest has been made; and for money due from corporations and individuals to their daily or monthly employees, from and after the end of each month, unless paid within fifteen days thereafter.

Kan. Stat. Ann. § 16-201.

Before assessing the district court's application of the statute, we must determine our standard of review. There is authority that federal, rather than state, law governs the standard of appellate review. *See Felder v. United States*, 543 F.2d 657, 664 (9th Cir. 1976) ("In general, the standard of appellate review is a procedural matter in which the forum will utilize its own standards even when it is applying the substantive law of another jurisdiction."). But in this case we need not decide which law governs because both Kansas and federal law provide an abuse-of-discretion standard. *See United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1236 (10th Cir. 2000) ("We review a decision to grant or deny prejudgment interest for an abuse of discretion."); *Blair Constr. Inc. v. McBeth*, 44 P.3d 1244, 1251-52 (Kan. 2002) ("Allowance of prejudgment interest is a matter of judicial discretion subject to reversal only upon a showing of abuse of discretion.").

A more challenging question is whether abuse-of-discretion review must be modified when, as here, the parties have stipulated to the underlying facts.

-12-

Dr. Hofer contends that in this circumstance we should review de novo. We believe otherwise. De novo review is appropriate when deciding definitive legal issues. It is inappropriate when there is need for give in the joints. Even when stipulated historical facts resolve the underlying liability, awarding prejudgment interest requires weighing too many inexact factors for us to establish firm rules for decision. We are unable to construct an algorithm that spits out the legally required result, or, to be more precise, we are confident that any algorithm we constructed would provide unsatisfactory results far too often. Although in a specific case the correct decision may be clear, by and large the decision involves "'multifarious, fleeting, special, narrow facts that utterly resist generalization.'" *Pierce v. Underwood*, 487 U.S. 552, 561-62 (1988) (*quoting* Maurice Rosenberg, *Judicial Discretion of the Trial Court, Viewed from Above*, 22 Syracuse L. Rev. 635, 662-63 (1971)). "Familiar with the issues and litigants, the district court is better situated than the court of appeals to marshal the pertinent facts and apply the fact-dependent legal standard . . . ." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 402 (1990) (mandating abuse-of-discretion review of ruling under Fed. R. Civ. P. 11). Moreover, a decision regarding how much, if any, prejudgment interest to award "grows out of, and is bounded by, case-specific detailed factual circumstances[, which] limit[ ] the value of appellate court precedent." *Buford v. United States*, 532 U.S. 59, 65-66 (2001) (mandating abuse-of-discretion review

-13-

of issue arising under United States Sentencing Guidelines). Accordingly, in our view, a proper division of responsibility between the district and appellate courts counsels application of an abuse-of-discretion standard of review even when the historical facts are undisputed.

"In Kansas, prejudgment interest is allowed on liquidated claims. 'A claim becomes liquidated when both the amount due and the date on which it is due are fixed and certain, or when the same become definitely ascertainable by mathematical computation.'" *Green Constr. Co. v. Kansas Power & Light Co.*, 1 F.3d 1005, 1010 (10th Cir. 1993) (quoting *Plains Res., Inc. v. Gable*, 682 P.2d 653, 657 (Kan. 1984)). We defer to the district court's determination that the benefits and premium refunds owed to Dr. Hofer were not "due" until December 31, 2001, the date by which UNUM had sufficient information and a reasonable time to determine that Dr. Hofer was disabled. To be sure, UNUM has conceded that Dr. Hofer was disabled well before that date. But UNUM had no duty to pay benefits or refund premiums until Dr. Hofer had submitted a valid claim providing UNUM with sufficient proof of loss.

Dr. Hofer's argument to the contrary appears to rely on his contention that UNUM was in breach of contract when it denied his 1995 claims and that submitting further information to support those claims would have been a useless act. But we have rejected those contentions. The district court did not abuse its

-14-

discretion in awarding prejudgment interest only from December 31, 2001, forward.

### III. Definition of Prior Net Income

Under the UNUM disability policy, the amount of the benefit is derived from the insured's "prior net income." Aplt. App. Vol. I at 135. Dr. Hofer argues that UNUM and the district court misinterpreted the term. He contends that the policy definition of *prior net income* is ambiguous and should be interpreted against UNUM. Although Dr. Hofer is correct that "under Kansas law any ambiguity in the agreement is to be construed against the drafter . . . ," *Time Warner Entertainment Co. v. Everest Midwest Licensee, L.L.C.*, 381 F.3d 1039, 1045 (10th Cir. 2004), we agree with the district court that the language is not ambiguous.

"Whether a contract's provisions are ambiguous is a matter of law to be determined by the court," *Flight Concepts Ltd. P'ship v. Boeing Co.*, 38 F.3d 1152, 1156 (10th Cir. 1994), and therefore is reviewed de novo, *see Time Warner,* 381 F.3d at 1044. "The test to determine whether an insurance contract is ambiguous is not what the insurer intends the language to mean, but what a reasonably prudent insured would understand the language to mean." *Colfax v. Johnson*, 11 P.3d 1171, 1175 (Kan. 2000). "In determining whether ambiguity exists, the language of the contract is to receive a fair, reasonable, and practical

-15-

construction." *Marquis v. State Farm Fire & Cas. Co.*, 961 P.2d 1213, 1219

(Kan. 1998).

The UNUM policy provides for residual-disability benefits according to the

following formula:

$$\frac{\text{loss of net income}}{\text{prior net income}} \times \text{Maximum Disability Benefit}$$

Aplt. App. Vol. I at 135. The denominator *prior net income* is defined as

> the largest of: (1) your average monthly net income for the last 12 months before the Elimination Period began [i.e., the 12 months before the disability began]; (2) your average monthly net income for the 12-month period immediately before those 12 months; or (3) the highest average monthly net income for any two consecutive years of the last 5 years before the Elimination Period began. On each anniversary of the first day of a period of disability, we will calculate a [cost-of-living] Factor. We will multiply the prior net income by that Factor. Then we will use that amount to calculate the Residual Disability Benefit or the Recovery Benefit.

*Id*. The first sentence of this definition sets prior net income for the first

disability period as the largest of three calculated amounts, each of which is an

approximation of what the insured was making before becoming disabled. The

remainder of the definition provides that this figure will be indexed for inflation

for each successive year of disability. The policy defines the numerator *loss of*

*net income* as "your indexed prior net income minus the net income you earned

for the month to which the payment relates." *Id*.

Roughly speaking, the formula provides that the insured will receive a percentage of the maximum disability benefit equal to the percentage of income lost as a result of disability. If the insured's disability reduces his income by, say, 20%, then the benefit due is 20% of the maximum benefit permitted. If in subsequent years the insured suffers a greater (lesser) loss of income, then the benefit will be a higher (lower) percentage of the maximum benefit. The inflation adjustment is necessary to avoid unfairness to the insured. Without the adjustment, the "loss of net income" in a later year would be (1) the prior net income (approximately the amount earned before disability) minus (2) the amount earned in the later year. If the rate of inflation were high enough, a disabled insured who has had to reduce his work by 20% might still earn as much as when he was not disabled, so the "loss of net income" would be $0, and he would receive no disability benefit under the policy. With the inflation adjustment, however, a disabled insured who continues from year to year having to reduce his work load by the same amount (say, 20%) will continue to receive the same benefit even though his income increases at the same rate as inflation.

Dr. Hofer, however, would construe the policy definitions differently. In his view, the numerator *loss of net income* is indexed for inflation but the denominator *prior net income* is not. He focuses on the fact that the policy defines *loss of net income* as "your *indexed* prior net income minus the net income

you earned for the month to which the payment relates." *Id.* at 135 (emphasis added). He points out that if *prior net income*, the numerator of the fraction, already incorporates indexing in its definition, then the word *indexed* in the definition of *loss of net income* is superfluous. He concludes, "The definition of the numerator, 'loss of net income' specifically refers to indexing, while the denominator, 'prior net income' fails to use the same term. This reasonably implies the former is indexed, while the latter term is not." Aplt. Br. at 41. At the least, according to his argument, the use of the word *indexed* in the definition of *loss of net income* creates an ambiguity, which should be resolved against UNUM.

We disagree. The use of the word *indexed* in the definition of *loss of net income* is clearly just to emphasize that the cost-of-living factor referred to in the definition of *prior net income* (and which, according to that definition, is to be "use[d] . . . to calculate the Residual Disability Benefit," Aplt. App. Vol. I at 135) applies also when using prior net income to calculate loss of net income. An alternative reading of contract language does not create a legal ambiguity unless that reading is "reasonable," *Marquis*, 961 P.2d at 1219, and Dr. Hofer's reading is not reasonable. Under his interpretation of the formula, a period of inflation would cause the benefit to depart from its intended purpose of reflecting the extent of the insured's disability; indeed, the loss of net income could, after

-18-

several years of inflation, exceed the unindexed prior net income, so that the numerator of the fraction exceeds the denominator and the benefit exceeds what the insured would be entitled to for total disability. This is a strained reading of the policy language and it creates a nonsensical result. The district court was undoubtedly correct in rejecting Dr. Hofer's contention and finding no ambiguity in the definitions: "The only reasonable interpretation of the language is that during the first year, prior net income is not indexed, but during subsequent years, prior net income is indexed in order to take inflation into account in both the numerator and the denominator of the residual disability benefit equation." Aplt. App. Vol. II at 345.

**IV. Increase in Maximum Disability Benefit**

Dr. Hofer's disability-income policy states:

> On each annual review date until the policy anniversary when your age is 55, you will automatically have the opportunity to increase the Maximum Disability Benefit by the Indexed Amount *provided that you are not then disabled* and you have not refused the opportunity to increase your coverage in two consecutive years. . . .
>
> When the opportunity is made available, you may increase the Maximum Disability Benefit by paying the premium for the increased amount. The premium will be based on your age on that policy anniversary and the premium rate then in effect for this plan. . . .

Aplt. App. Vol. I at 136 (emphasis added).

In May 1995 Dr. Hofer received a letter from UNUM informing him of this potential increase in his monthly benefit under an identical provision in the

overhead policy. The letter stated, "If you do not wish to take advantage of this valuable offer, please call us at [this number]." *Id*. at 150. Dr. Hofer did not call and in June 1995 his monthly benefit was increased, as was the premium. Although the record contains no further correspondence regarding these increases, Dr Hofer received similar increases under both policies in June 1996, 1997, and 1998, and paid higher premiums as a result. He contends that the district court erred in rejecting his claim for the increase in benefits and ordering only that UNUM refund the increase in premiums. We disagree.

The parties have stipulated that Dr. Hofer was disabled from March 15, 1995, forward. The district court ruled that his disability rendered Dr. Hofer ineligible for the benefit increases, which were conditioned on being "not then disabled." *Id*. Vol. II at 347-48. Dr. Hofer counters that the language of the policy does not prohibit someone who is disabled from receiving the increased coverage, but only restricts when they are "automatically" entitled to the increase. In other words, there may be no *automatic* opportunity to increase your benefits when you are disabled, but there may still be *an* opportunity. We reject this argument. Proper construction of a written contract is a question of law, which we review de novo. *See Time Warner,* 381 F.3d at 1044.

Dr. Hofer purchased insurance coverage that provided particular benefits in return for payment of particular premiums. The policy, however, offered the

opportunity to increase benefits in certain circumstances without his having to take out a new, additional policy. For example, a rider to the policy enabled him to increase benefits every two years by completing an application and paying a premium for the increased coverage. The annual "automatic" provision is another such provision.

To increase benefits under the policy, Dr. Hofer would have to acquire additional coverage in accordance with such a policy provision. The record clearly shows the increases in the years 1995 through 1998 were under the "automatic" provision. The letter to Dr. Hofer regarding the potential increase in premiums amounted to notice of the policy provision. Dr. Hofer is correct that the provision did not forbid him from obtaining increased coverage in some other way, but he does not point to any other language in the policy that authorized the increase. Accordingly, he is bound by the conditions imposed on the automatic increases, and his admitted disability disqualified him from receiving the additional benefit under that provision.

Dr. Hofer argues that "a contract was formed to provide such increases in the benefit, *even if the policy prohibited such increases*, as the parties made a separate agreement otherwise." Aplt. Br. at 49. He suggests that his payments of increased premiums, and UNUM's acceptance of his payments, created a new, distinct contract. But he fails to establish what the terms of this new contract

were.  He seems to believe that the terms were identical to his original policy with one exception—there was no disability disqualification for increased benefits. Yet he refers to nothing in the record from which one could infer that the parties agreed to all but this one term from the original policy.  We cannot construct the purported separate agreement out of whole cloth.

A more plausible approach is Dr. Hofer's alternative argument that the original policy is the source of his claim for additional benefits, but that UNUM is barred by waiver or estoppel from enforcing the policy's no-disability requirement because it offered him the increases and he accepted them.  These arguments might have some merit if UNUM had been aware that Dr. Hofer was disabled at the time the increases were offered.  But Kansas law would recognize neither waiver nor estoppel on the facts of this case.  The opinion in *United American State Bank & Trust Co. v. Wild West Chrysler Plymouth, Inc.*, 561 P.2d 792 (Kan. 1977), is illustrative.  Wild West sold a vehicle to Kathleen and Ronald Lorg.  The Lorgs executed a note and security agreement, which Wild West assigned to United.  The assignment clause contained an express warranty from Wild West to United that the buyers were over 21 and had the capacity to contract.  Although Ronald Lorg was only 17, United was not aware of this fact at the time of the assignment.  When the Lorgs defaulted and United sued Wild West for breach of warranty, Wild West argued that United was barred by waiver and

estoppel.  The Kansas Supreme Court defined the scope of waiver and estoppel as

follows:

> Waiver . . . implies that a party has voluntarily and intentionally renounced or given up a known right, or has caused or done some positive act or positive inaction which is inconsistent with the contractual right. . . .
>
> . . . A party asserting equitable estoppel must show that another party, by its acts, representations, admissions, or silence when it had a duty to speak, induced it to believe certain facts existed.  It must also show it rightfully relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts.

*Id*. at 795.  The court found neither doctrine applicable:

> Wild West's reliance on waiver and equitable estoppel is predicated on United's knowledge of Ronald Lorg's age.  The trial court found that United did not know that Ronald was seventeen at the time the note was purchased. . . . The trial court correctly held that United did not waive its right to rely on the warranty and is not estopped to enforce it.

*Id*.  The absence of knowledge of the critical fact precluded the defenses of

waiver and estoppel.

Likewise, Dr. Hofer's waiver and estoppel arguments must be predicated on

UNUM's knowledge that Dr. Hofer was disabled at the time it accepted his

payments for benefit increases.  But UNUM had denied Dr. Hofer's 1995

disability claim and he had not pursued it further.  As far as UNUM knew,

Dr. Hofer was *not* disabled.  Because UNUM did not know that Dr. Hofer was

disabled, it could not have knowingly waived the condition that he not be disabled

-23-

when he took the opportunity to increase his benefits, and it cannot be estopped from relying on the contractual condition.

**V. Attorney Fees**

Dr. Hofer sought $109,500.00 in attorney fees from UNUM. Based on the "unique" features of the case, Aplt. App. Vol. II at 552, the district court awarded $54,716.25. The court reasoned that because Dr. Hofer succeeded in obtaining about half the relief he sought, and because nearly all this success occurred well before final judgment, Dr. Hofer should receive fees for about half of his attorney's time on the case. It awarded Dr. Hofer fees for 106.4 partner hours at a rate of $250 per hour, 154.9 associate hours at $175 per hour, and 13.45 paralegal hours at $75 per hour. Dr. Hofer argues on appeal that the district court had no basis for failing to award the full amount. We disagree.

"Under Kansas law, the prevailing party in a lawsuit may recover attorneys' fees where such is specifically authorized by statute or contract." *Neustrom v. Union Pac. R.R.*, 156 F.3d 1057, 1067 (10th Cir. 1998) (internal quotation marks omitted). Dr. Hofer sought attorney fees under Kan. Stat. Ann. § 40-256 (1980), which provides that when an insured prevails against an insurance company, "if it appear from the evidence that such company . . . has refused without just cause or excuse to pay the full amount of such loss, the court in rendering such judgment shall allow the plaintiff a reasonable sum as an attorney's fee for services in such

action. . . ." Kan. Stat. Ann. § 40-256 (1980). "Whether an insurance company has refused to pay a claim without just cause depends upon the facts and circumstances of a particular case. If a good faith legal controversy exists as to liability, attorney fees must be denied." *Allied Mut. Ins. Co. v. Gordon*, 811 P.2d 1112, 1125 (Kan. 1991). "Whether there was just cause to refuse payment and therefore justification for denial of attorney's fees is in the trial court's sound discretion." *Watson v. Jones*, 610 P.2d 619, 626 (Kan. 1980). We review the district court's award of attorney fees for an abuse of discretion, but review the underlying legal analysis de novo. *Scott's Liquid Gold, Inc. v. Lexington Ins. Co.*, 293 F.3d 1180, 1183 (10th Cir. 2002).

The district court determined that UNUM's denial of Dr. Hofer's claim in 2001 was without just cause, so that he was entitled to an attorney-fee award. Kansas law provides that in determining a reasonable fee the court should consider

> the amount and character of the services rendered; the labor, time and trouble involved; the nature and importance of the litigation or business in which the services were rendered; the responsibility imposed; the amount of money or the value of the property affected by the controversy, or involved in the employment; the skill and experience called for in the performance of the services; the professional character and standing of the attorney; [and] the results secured . . . .

*City of Wichita v. Chapman*, 521 P.2d 589, 598 (Kan. 1974) (internal quotation marks omitted).  Dr. Hofer does not challenge the hourly rates used by the district court, only the number of hours to be compensated.

The district court found that Dr. Hofer's attorney had "invested significant time" in what was a "complicated" case requiring a "high" degree of skill and involving a "substantial" amount of money.  Aplt. App. Vol. II at 554.  It further noted, however, that although Dr. Hofer had prevailed on some of the issues, he had lost on others.  Moreover, counsel was hired in June 2001, and almost all his success occurred during his first year representing Dr. Hofer.  The second claim presented to UNUM was denied on December 31, 2001, and this suit was filed on January 15, 2002.  About six months after Dr. Hofer filed suit, UNUM agreed to pay approximately $510,000 in benefits and premium refunds.  At this point in the litigation—the end of June 2001—Dr. Hofer's attorney had expended approximately 50 hours, some of which would not have been recoverable because, as the district court noted, it was time spent pursuing the benefits claim before preparing to file suit.  Dr. Hofer then sought additional benefits and premium refunds.  As the district court said, "Although [Dr. Hofer] did not file a new lawsuit, he essentially added claims to his case." *Id.* at 553.  But the additional claims, which were resolved by the court's order of January 29, 2004, did not achieve the same measure of success as the original ones.  Dr. Hofer recovered

less than $26,000 of the additional $478,000 he sought. The district court determined that UNUM's rejection of these additional claims was not without just cause, as there was a good-faith legal dispute surrounding each. *See Allied Mut. Ins. Co.*, 811 P.2d at 1125 ("If a good faith legal controversy exists as to liability, attorney fees must be denied.")

Dr. Hofer argues that the district court relied too much on the fact that UNUM agreed early in the litigation to make certain payments because he still "fought tooth and nail throughout the case for monies that trickled in from UNUM . . . ." Aplt. Br. at 55. But the time awarded was far more than the approximately 50 hours that had been expended before UNUM reversed course and agreed to pay what Dr. Hofer had sought to that point. The award is supported by the considerations permitted by Kansas law. *See Chapman*, 521 P.2d at 598. In particular, the award compensated Dr. Hofer for the portion of his attorney's time that secured favorable results. We hold that the district court did not abuse its discretion, and we deny Dr. Hofer's request for attorney fees on appeal.

**VI. Conclusion**

We AFFIRM the judgment of the district court.